# CHARLESTON.

## STATE v. GEBHART.

Submitted December 12, 1911.   Decided January 30, 1912.

1.   ARSON—*Criminal Prosecution—Sufficiency of Evidence.*
     A case involving circumstantial evidence discussed, and the evidence held to be sufficient to warrant a verdict of guilty. (p. 233).

2.   CRIMINAL LAW—*Writ of Error*.

   Error which works no prejudice to the party complaining, is
   not cause for reversal.   (p. 246).

3.   FORMER DECISIONS FOLLOWED.

   Insufficiency of affidavits in support of a motion for a new
   trial, discussed.   Points of syllabi in *Jacobs* v. *Williams*, 67 W.
   Va. 377, *State* v. *Slowers*, 66 W. Va. 198, and *State* v. *Huffman*,
   69 W. Va. 770, 73 S. E. 292, on this subject, approved and ap-
   plied.   (p. 247).

4.   CRIMINAL LAW—*Trial—Reception of Evidence—Striking Out Ev-
      idence.*

   If the court is asked to strike out certain improper evidence
   that has gotten before the jury, and does so, and states in the
   presence of the jury that it is stricken out, specifying the part
   stricken out, it is not indispensable that he should expressly tell
   the jury not to consider it as evidence.   This Court will presume
   that the jury understood that they were not to regard such evi-
   dence in arriving at their verdict, and that they did not.   (p.
   242).

Error to Circuit Court, Nicholas County.

Charles Gebhart was convicted of arson, and brings error.

*Affirmed.*

*John B. Morrison, Linn & Byrne* and *Edward A. Brannon,*
for plaintiff in error.

*William G. Conley,* Attorney General, and *J. O. Henson,* As-
sistant Attorney General, for the State.

WILLIAMS, JUDGE:

Charles Gebhart was convicted of arson in the circuit court of
Nicholas county, October 29, 1910, and sentenced to confine-
ment in the penitentiary for an indeterminate period of time,
ranging from one to ten years.   On his petition a writ of error
was granted at the June term 1911.

He was charged with having set fire to the building in which
he conducted a mercantile business, in the Town of Richwood,
for the purpose of injuring and defrauding certain fire insur-
ance companies that had insured his stock of merchandise and
household furniture against loss by fire. The evidence is volu-
minous and circumstantial in character. The building was a

frame structure, 28x100 feet, and one story in height.    It rested on posts, and a storage room was formed underneath by weather boarding being nailed to the posts on which the building stood. ˙ Small rooms were partitioned off,. at the back end, and were occupied by defendant and his family as a dwelling place, and the front part of it was used as a store room.    The family consisted of defendant, his wife and four children, the oldest being fifteen, and the youngest four years old.

The fire originated in the basement, and was discovered about four o'clock on Monday morning, August 8th, the alarm was given and the fire extinguished before the building, or any of the goods were consumed, but not until it had burned through the floor in one or two places, and had very much charred the joists underneath the floor.    ˙

On Sunday, the day before the fire, the Baltimore & Ohio Railroad ran an excursion train from Richwood to Clarksburg and return, and defendant and his wife had planned to go on this excursion.    For some reason, however, defendant did not go, but remained at home with his children, and Mrs. Gebhart went in company with Mr. and Mrs. Andrews, friends who lived just across the street from the Gebharts.    The train was due to return at 12 o'clock midnight, but did not arrive until something near 1:30, Monday morning.    Defendant and his two daughters, Lillie and Thelma, did not retire but remained up to meet the folks returning from the excursion.    Defendant had prepared a lunch for them, and on their arrival they all went into the Gebhart dwelling by way of the front door of the store room, which was the main entrance to the dwelling apartments, as well as to the store room, and partook of the lunch.    After this, Mr. and Mrs. Andrews went to their home across the street, and defendant and his family retired.    Jerome Gebhart did not remain up, but went to bed early in the night with his little brother, and was asleep until after the train came in.    Defendant slept by himself, on a cot or lounge, near the door which opened out, and near to a little back porch from which a stairway led down to the basement door.    ˙

About four o'clock Mrs. Gebhart was awakened by the presence of dense smoke in her bedroom, and immediately aroused the family, and they all came out by way of the front door,

Jerome being the first one to get to the door and unlock it.
There is much testimony to prove that defendant was dressed
and had his shoes on, while the other members of the family
were in their night dress, or had something loosely thrown
around them.

In order to sustain the charge of arson two essential facts
must be proven: (1) That the fire was of incendiary origin;
and (2) the identity of the incendiary. In the present case it
is admitted that the fire was not an accident. Every material
circumstance in the case points to the fact that the fire was of in-
cendiary origin. Indeed, the theory of the state, borne out by
the facts and circumstances testified to by numerous witnesses,
is that defendant deliberately planned to make it appear as if
some one had broken into the basement and set fire to the house
with the intention not only to burn his store but himself and
family as well, and then set fire to it himself. And the theory
of the defense is that the fire was started by one Sadie Bennett,
whom defendant was instrumental in having arrested a week,
or such time, before the fire on the charge of keeping a bawdy
house. There is no evidence to connect Sadie Bennett with the
crime, although suspicion, for a while, rested on her, because
of defendant's declarations to several persons before the fire
that he feared she would do him harm. She lived in an adjoin-
ing building.

The evidence of defendant's guilt is wholly circumstantial.
No one saw him set the fire. But the following facts are
strongly supported by testimony of many witnesses for the state,
and some of them by witnesses for defendant as well, and from
them the jury could very properly find defendant guilty.

At the time of the fire defendant had his stock of goods in-
sured to the amount of $6,000 and his household effects to the
amount of $500. There was also insurance on the building,
which belonged to defendant's brother, Joel Gebhart, to the
amount of $2,000. About four weeks before the fire defend-
ant advertised a "Special Clearance Sale," and conducted this
sale up to the very day before the fire. Defendant himself
says that this sale was very successful, and that his sales, during
this time, ranged from $200 to $300 a day. An inventory of
the stock of goods, taken by the state, shortly after the fire

showed the value of the stock, at the date of the fire, to be much less than the amount of the insurance.

The basement extends the full length of the building, and boxes were ricked up under the store room, not under the dwelling rooms, and the fire appears to have originated in these boxes, but did not entirely consume them. An empty oil can, or two, were found in the basement, which were shown to have contained kerosene oil, and a couple of Hayner's whiskey bottles, containing kerosene oil, were also found in an old cabinet in the basement. Defendant admits that he had Hayner's whiskey bottles, and that some of them may have been in the basement. The door to the basement was at the back end of the building, and was kept locked with a padlock. Defendant's son Jerome testified that he was in the basement, preparing kindling wood, on the Saturday evening before the fire, and that when he came out he locked the door. There is no evidence that anyone was in the basement after that time, until the night of the fire. After the fire the door to the basement presented the appearance of having been broken open. The bow, or shackle, of the padlock, was twisted, so that the loose end of it would not go in place in the lock. Defendant turned the lock and key over to the fire marshal who had the lock opened and examined by a silversmith in the town of Richwood. This silversmith was a witness, and testified that the inside mechanism of the lock had not been broken, or disturbed. The lock itself was also in evidence. The jury must have concluded, from this evidence, that the basement was entered by means of a key to the lock, and that the shackle was afterwards twisted, to create the impression that the cellar had been broken into.

The rope connecting with the bell on the hose house was cut off, so high up from the floor that a man of ordinary height, standing on the floor, could not reach it. The fire plug wrenches which were in a box on the hose cart in the hose house, could not be found at the time of the fire, and were found a short time afterwards, hidden on the outside of the hose house underneath a hole in the wall, where they had apparently been dropped through from the inside. There was an empty box in the hose house, about two or three feet high, which could have been used by some one to stand on, in order to reach the

point where the rope was cut. This box was, in fact, used by the man who rang the bell to give the alarm of fire. From the following facts and circumstances, and other evidences in the case, the jury were justified in believing that defendant himself cut the bell rope. One John Milam had been arrested for disorderly conduct on Sunday, and placed in the lockup. The lockup stood just back of the hose house. Milam was anxiously looking for the sergeant to release him from prison that night. He was examined as a witness, and testified that, late in the night, about eleven or twelve o'clock, he heard someone in the hose house, and heard something drop that sounded like a piece of iron, and that he thought it was the officer coming to release him. But when he, a little later, heard footsteps which indicated that the person who had been in the hose house was going away without releasing him, he shook the door of the lockup and halloed to be let out of that place. A few moments after that defendant informed the sergeant, standing on the street corner, that some one was trying to break out of the lockup. Defendant admits giving this information, but he denies that he was in the hose house, and says that he heard the noise, in the lockup, as he was passing by, going from the central telephone station to his house, that he had gone to the telephone station to see his two daughters, Lillie and Thelma, who were there with Miss Clara Wentzell. This evidence places the defendant at, or near to, the hose house at a late hour on the night of the fire, and proves that he had an opportunity to cut the bell cord.

The town is lighted by electricity, and some of the lights are turned out at midnight. Clara Wentzell testifies that she and defendant's daughter, Thelma, went to the store, just after the lights went off, to inform him that Lillie, his other daughter, intended to stay at the telephone station until the train came in, and that defendant himself came to the store door. This fact is not denied, and it proves that defendant was in his store alone, after midnight, and before the train arrived. He, therefore, had opportunity to rick the boxes in the basement, and to pour the oil at the front door, both on the inside and outside. Defendant's son, Jerome, it will be remembered, had retired early in the night with his little brother, and was then asleep

in his room at the back part of the building.  He says he, did not wake up until "just a few minutes" before the train came. He also says that, sometime in the night, after he had gone to bed, he heard a noise in the cellar, and a little later heard some-one at the back of the house hammering on something.  He does not testify that he then knew where his father was, and the jury may have believed that it was his father whom he heard, and that he was then ricking the boxes in the cellar, and twisting the shackle of the padlock, to create the impression that the cellar door had been broken open.

Some excelsior which smelled strongly of kerosene was found on the back steps, and kerosene was also found on the floor, at the front entrance to the store, both on the inside and outside of the door.  But it is proven that the floor, on the inside, slopes towards the door, and that liquid poured on the floor of the recess to the front door, on the outside, would not run through to the inside.  This proves that the oil, on the inside, must have been put there by some one from the inside of the store room, and the jury may well have believed that person was defendant.  When defendant's wife and her friends returned from Clarksburg, and the company, including defendant, were going in at the front door of the store, Mrs. Gebhart remarked that she smelled oil.  Defendant did not investigate to ascertain where the odor originated, nor did he express surprise, notwith-standing he had previously expressed fear of Sadie Bennett, but replied immediately and said that he had spilled some milk on the stove, and in order to kill the smell he had burned some sugar.  The explanation so readily forthcoming from defendant adds much to the significance of the fact that oil was found at the door.  The jury may have concluded that defendant put the oil on the floor, and that he burned the sugar, not, however, to kill the smell of milk, but to kill the smell of the oil.  From this, and other facts and circumstances in the case, the jury must have thought the defendant had manufactured evidence, by creating certain appearances, for the purpose of inducing the belief in the minds of others, that some person had planned to burn, not only his store but himself and family also, and had arranged to cut off their escape, both at the front and the back entrance to the building by the use of oil at those places.  De-

fandant stated to the sergeant on the street, the night of the fire, that he was afraid that Sadie Bennett meant to do him harm.   He made a similar statement to Mr. Eskridge in the afternoon of the same day.   But does it not seem passing strange that, when his wife said she smelled oil, when they were entering the store door, he did not make investigation?   No doubt, if he had done so, the oil would have been found, as it was found to be there after the fire was extinguished.   One witness who was present at the fire testified that he struck a match at the front door to look for something, and dropped it, while it was yet ablaze, and that there was so much oil that it ignited and flamed up.

It was proven that defendant used electric lights in his building, that he also had two large brass lamps suspended from the ceiling of the store room, to be used in case the electric light failed, that he had one small lamp for use in the dwelling rooms, in case of necessity.   Notwithstanding defendant had little use for kerosene oil, especially in the summer time, it was proven by a number of witnesses, that about a month before the fire he purchased two five gallon cans of oil from two different dealers in Richwood.   But he denies this, as he does also the testimony of all the other witnesses for the state, who testify in relation to any fact or circumstance that points to his guilt.

Certain it is that the fire was of incendiary origin, and it is almost as certain too that, to insure the destruction of the building, if not of a large portion of the town as well, the bell cord was cut and the fire-plug wrenches were hidden.   It was undoubtedly a deep laid scheme.   But, "The best laid schemes 'o mice an' men Gang aft a-gley."   So it turned out in this case, for the dry goods box in the hose house made it possible to ring the bell without much delay, and the fact that some members of the fire company had wrenches at their homes and took them with them when the alarm was sounded, caused no delay in turning on the water.   The building and its contents were saved.

In view of these facts: that Jerome and the baby were sleeping in the building; that the town was lighted with electricity; that a number of people were on the street that night, passing back and forth, waiting for the return of the excursion train; that defendant's store was on one of the principal streets of the

town; that defendant himself passed by his store several times late that night, and was in it at a very late hour, after some of the lights had been turned off; that defendant had the opportunity to do all these things which point so unmistakably to incendiarism, the jury evidently conclude that it was hardly possible for Sadie Bennett, or any other person without the guilty knowledge of defendant, to have committed the crime. In view of so strong a chain of connected circumstances, tending to connect defendant with the crime, and at the same time tending to exclude the hypothesis that another person could· have committed it, the jury must have believed, without any reasonable doubt, that defendant was guilty. It is the case of a man's falling into the pit which he has digged for another.

Counsel for defendant insist that it is unnatural, unreasonable and, therefore, unbelievable that defendant would have set fire to the building and thus have risked his own life, and the lives of his entire family. This is plausible, and strong argument, when we consider that no reason existed for defendant's wishing to destroy his family. But the jury may have believed, as they evidently had the right to do, that defendant was awake and was only feigning sleep, that he would have given the alarm himself, if necessary, in order to rescue the family from the building, but that he thought he would be less likely to be suspected, if some one else should give the alarm. The fire originated under the store room, not under the dwelling. The back door, and windows in the sides of the building, furnished means of escape, if necessary. · He slept on a lounge near to the back entrance, by himself, and after the alarm of fire was given, he appeared on the street dressed, according to some of the state's witnesses, while other members of the family were in their night clothes. The state does not claim that any other member of the family knew of the scheme, nor does the evidence indicate that they did. Their conduct seems to be both natural and reasonable in view of so exciting a time as to awake and find the house in which one is sleeping on fire. They were all very much excited. Jerome was the first to open the store door and run out into the street. He was in his night dress, but ran towards the hose house, holloing "fire." A witness for the state testifies that he heard his father call to him to come back and put on his clothes,

saying that he had plenty of time. Defendant denies this, but the jury judged between the witnesses. If it be true, it tends to prove that defendant was not anxious to have the fire extinguished. Jerome was the first to reach the hose house, and he says the bell rope had been cut off, and he could not reach it. Another man, dressed and sitting on the porch of an hotel nearby, arrived at the hose house a moment later, and he got on a box and rang the bell, and Jerome started, with the hose cart, for the fire, and others who had then gathered on the scene came to his assistance.

There is another circumstance which the jury must have believed was manufactured for defendant's purpose. It is this. Defendant testified that, after the fire and before the inventory of the stock of goods was taken, his store was broken into, from the back door, and that some of the goods were stolen. This evidence was for the purpose of proving that he had more goods in the store, at the time of the fire, than were shown by the inventory. In rebuttal of this testimony, the state proved that the marks on the door, and the door facing were made with a chisel, or some similar instrument, that the impressions in the wood showed that the door could not have been pried open in the manner indicated by the marks, because they had been made by prying the door shut, rather than open. Pieces of wood, bearing the impressions, were sawed out, and were exhibited to the jury at the trial. An old chisel was also found in a basket, on the inside of the door, shortly after the alleged breaking, which fit into the marks on the pieces of wood. True, defendant and every member of his family who testified on the subject disclaimed the chisel, and denied having any knowledge of it.

There are many other little facts and circumstances which point to defendant's guilt, but it is unnecessary to detail them further, nor would we have discussed the evidence to the extent which we have already done, except for its peculiar character, so apparently manufactured by the defendant for the purpose of diverting suspicion from himself, and yet so conclusively proving his own guilt. The trial of the case occupied nearly two weeks. There was an array of able counsel on both sides, and the cause is briefed, elaborately and well, in this court on both sides. It was tried by a careful and able circuit judge,

and he again reviewed the evidence and his rulings after the evidence had been transcribed, in passing on a motion to set aside the verdict. It is our opinion, as it was his, that the verdict is supported by the evidence.

It is insisted that the court erred in admitting testimony concerning the rate of fire insurance prevailing in Richwood, which seems to be higher than in most other towns in the state, because of the greater hazard on account of the character of the buildings in Richwood. Such evidence was admissable, as bearing upon the question of defendant's motive for carrying so large an amount of insurance. Whether defendant was paying a high rate of premium for legitimate protection, or for the purpose of injuring the insurer by burning his property, were questions to be considered by the jury. He would more likely be willing to pay a high rate if his purpose was to defraud.

Fire Marshal Ellison, a witness for the state, was asked to state what his duties as fire marshal were, and replied as follows: "Well, the duties of the State Fire Marshal are rather numerous. My duty as Fire Marshal is to keep a record of all the fires that occur in the State of West Virginia as reported to me by Justices of the Peace and chief of fire departments and mayors of towns to establish, if possible, the causes of these fires and origin of the fires. Also my duty to take up properties where there is reports made on them of any hazards there and endeavor to remove these hazards and in that way keep down fire waste and in connection with fires of unknown origin if it developes in any circumstances that it is of incendiary origin it is the duty of the Fire Marshal to take a note of that fire and establish who the guilty party is and if they decide that there is evidence enough to warrant it, it becomes their duty to go further and cause that party to be arrested and follow the case then on through the Courts.

"Defendant, by counsel objects to the foregoing answer and moves to exclude same.

"Statement by the Court: I will strike out from that testimony that part of it in which he states his duty as to investigating and determining whether the evidence is sufficient to warrant prosecution and follow it up. To which ruling of the

Court in not sustaining all of said objection the defendant excepted."

It is insisted, by counsel for defendant, that this evidence was highly prejudicial, as constituting, in effect, an expression of opinion by the fire marshal that defendant was guilty; that simply striking it out was not sufficient to disabuse the minds of the jurors of the impressions which it had created. · They say the court should have gone further, and have expressly told the jurors not to consider it as evidence in the case. But how could the jury have understood the court's language, otherwise than to mean that it was not to be regarded by them as evidence? It does not seem to us that it could have had any other meaning to the jury. Juries must be given credit for a reasonable degree of intelligence, and certainly a reasonably intelligent man could not have misunderstood the court. It is not necessary to decide, and we do not decide, that the evidence was, in fact, prejudicial. But assuming that it was, we are clearly of opinion that the jury fully understood that they were not to consider it. We admit that it is the usual practice for the trial courts, when striking out improper evidence that has gotten before the jury, to tell them that the part stricken out is not to be considered as evidence. But must we be so technical as to say that the omission to do so constitutes reversible error? One or two of the courts of this country have apparently gone so far as to so hold. We do not think that the administration of justice is promoted by so technical a requirement, and we decline to establish such a rule in this state. We are not disposed to encumber the trial of causes with any more purely technical rules than are essential in enabling courts and juries to arrive at just results. Such a rule as we are asked to declare could not promote the ends of justice. It would not only be an useless refinement, but an insult to the intelligence of the citizenship that supplies our jurors. The judge's statement that he struck out the evidence, was intended as much for the jury as it was for counsel, and we mean no reflection on counsel when we say that both must have an equal understanding of its meaning. The court could have said nothing to remove it from the memories of the jurors.

The court sustained the state's objection to a statement which

Jerome Gebhart was about to make, concerning what his father said at the time his mother gave the alarm of fire, and this is assigned as error. It may have been admissible, as constituting a part of the *res gestae.* But it does not appear what the statement would have been, and we can not see that it was important. Under the rule so well established by former decisions, we can not say this was error. *State* v. *Clifford,* 59 W. Va. 1; *Walker* v. *Strosnider,* 67 W. Va. 39.

It was not error to admit the testimony of Edith Bacon, a sister of Sadie Bennett, in rebuttal, as to the value of certain property and the amount of insurance thereon, which she owned, situated in the same block with defendant's store and the property occupied by Sadie Bennett. It was proper evidence to be considered by the jury, in relation to any motive Sadie Bennett might have had to set fire to defendant's store. Defendant had offered evidence tending to prove malice on the part of Sadie Bennett toward him, and consequently a motive to do him injury. The testimony of Edith Bacon tends to prove that Sadie Bennett must have known that setting fire to defendant's property would have endangered her sister's property.

For the purpose of laying a foundation to impeach the testimony of Jerome Gebhart, he and Thelma were both asked on cross-examination if Jerome had not told a certain Haley boy, on the street, fixing the time and place, in the hearing of Gordon Umbarger, that his father's store had been broken into a few nights before that time, and that the thief had packed up some goods in sheets, but that he supposed he was frightened away before he had time to take them, and if Thelma did not then come up to Jerome and ask him why he had told the Haley boy that their father's store had been broken into, and if Jerome did not shake his head at her and beckon her across the street, and then have a whispered conversation with her. Jerome's answers amount practically to admissions of the conversation as comprehended in the question, Thelma did not admit or deny it, but claimed to have no recollection concerning it. Umberger was then put on the witness stand in rebuttal, and permitted, over objection of defendant, to prove the conversation and conduct of the two children on that occasion. In their testimony in chief the children had not been examined concerning the at-

tempted robbery. But defendant himself had previously testi-
fied that his store had been broken into, and that he had missed
some goods, and that some were piled up in sheets and left in
the store. The robbery occurred, if at all, after the fire, and be-
fore defendant's arrest, and the purpose of defendant's tes-
timony concerning it, was to prove that defendant had more
goods in the store at the time of the fire than were shown by
the state's inventory. The state submitted evidence tending
to prove that defendant's statement was not true, that it was a
manufactured story for the occasion. Such evidence was proper,
as bearing upon the question of motive for burning the store.
The truth or falsity of the story was properly an issue before the
jury, it was not a purely collateral matter. But the question
presented to us is, was it permissible to impeach the children
in that manner? It is strenuously urged by defendant's counsel
that it constitutes cause for reversal, that it is prejudicial to
defendant. It has given us more concern than any other point
assigned as error in the case. Speaking for myself alone, I am
clearly of the opinion that, if Jerome had expressly denied what
the question assumes to have taken place between him and his
sister and the Haley boy, it would have been proper to admit
the testimony of Umbarger to prove it, not as evidence of the
breaking, because as to that fact it would be hearsay, but it was
proper as tending to show the interest and bias of Jerome as a
witness. It tended to show that he was biased in favor of his
father to such extent as to engage, either in the manufacture of
evidence, or the concealment of the truth. Otherwise, why
should he call his sister to one side and have a private conver-
sation with her, after she had expressed surprise at the story
of the burglary. It was likely the first time she had heard of
it, and Jerome may have called her to one side to tell her what
to say, in other words, to bribe her, so that when they should
be examined there would be no conflict in their stories. In
weighing the testimony of Jerome, I think his conversation
and conduct on that occasion was proper to be considered by the
jury. It is analogous to, indeed almost identical with, the
case of a witness who has attempted to bribe another witness
to testify falsely in a case. There can be no doubt of the cross-
examiner's right to ask a witness, for the purpose of showing

his bias, if he did not offer to bribe a certain other witness in the case, fixing the time and place, and, if he should deny it, to prove that he did in fact attempt to bribe such witness. From the conduct of Jerome on that occasion, the jury could well have inferred that he was helping his father to manufacture evidence to prove that the store had been robbed, and that his little sister was ignorant of it, and that he called her to one side for the purpose of explaining it to her. But it is not necessary for us to decide whether it was proper or improper to admit the testimony of Umbarger, for the reason that we unanimously agree that, inasmuch as Jerome Gebhart practically admitted what Umbarger was permitted to testify to, defendant was not prejudiced, and the error, if such it be, is no ground for reversal.

Defendant offered evidence tending to prove that, at the time of the fire, some trunks and goods were carried into the street, and were left unguarded. This evidence was for the same purpose as the evidence of the burglary after the fire, and was, therefore, admissible. Defendant's own witness, R. L. Marshal, testified that the goods were not guarded, and was asked, on cross-examination, if he knew the trunks and goods were not guarded, and replied as follows: "I don't believe they were and it was the talk there of a great many people." Defendant's motion to strike this answer out was overruled, and this is one of the errors assigned. But, notwithstanding the answer is hearsay, and, therefore, inadmissable evidence, still it was favorable to defendant, for it tends to establish the very fact that defendant sought to prove by the witness in chief. This Court will not reverse the lower court for error committed on the trial, when it can be clearly seen that the error did not prejudice the party complaining.

A number of assignments of error relate to the refusal to give certain instructions on behalf of defendant, and to the giving of certain other instructions on behalf of the state. These instructions involve well settled principles of law. Some of the state's instructions are *verbatim* copies of instructions recently reviewed and sustained by this Court in *State* v. *Huffman,* 69 W. Va. 770, 73 S. E. 292. It is hardly necessary to again review them in this opinion.

We think that a number of defendant's instructions which were refused, correctly state the law, and are applicable to the case, and might properly have been given. But the jury were fully and fairly instructed in regard to the questions embraced in them by others which were given. Indeed, the reason assigned by the court for refusing them was, that they were repetitions of other instructions, a reason which our investigation has led us to believe was a good one. Defendant offered twenty-seven in number, and the state twenty-three, and the court refused defendant's Nos. 5, 11, 12, 14, 16, 18, 20, 21, 22, 23, 25 and 27, and gave, at the instance of the state its Nos. 1, 2, 3, 5, 6, 9, 10, 12, 13, 14, 17, 19, 22 and 23. We have carefully considered both those given and those refused, and we are clearly of the opinion that those given covered the whole subject of the law bearing upon any material facts supported in the case, and that they fairly presented both the theory of the state and the theory of the defense. We are impressed with the judge's absolute fairness and impartiality in his rulings upon these instructions, and no useful purpose could be accomplished by an extended discussion of the various instructions. We have already extended this opinion to a much greater length than we thought would be necessary when we entered upon its preparation, but the size of the record, the unusual character of the case, the number and peculiarity of the circumstances, constituting an unbroken chain of evidence which the jury must have believed was sufficient to establish defendant's guilt, furnish some palliation for its length.

Affidavits were filed in support of a motion for a new trial, on the ground of after-discovered evidence. We have recently had occasion to pass upon affidavits filed for a like purpose, in *Jacobs* v. *Williams,* 67 W. Va. 377; *State* v. *Stowers,* 66 W. Va. 198, and *State* v. *Huffman,* 69 W. Va. 770, 73 S. E. 292. We think the law on this question is well settled. The affidavits show that the absent witnesses are not in the state, that one of them, presumably the most important one, Maud Bennett, a daughter of Sadie Bennett, was in Pittsburg at the time the affiants last saw her. Affidavits of the absent witnesses themselves are not produced; it does not appear what these absent witnesses would swear to and, of course, it does not appear that their tes-

timony would likely produce a different result, if a new trial were granted. They do not measure up to the rule laid down in the cases cited. Moreover, a counter-affidavit proves that Maud Bennett was present in the court house, on several days, during the trial of the case, and that she was not called as a witness, or consulted by defendant, or his counsel, to ascertain what she could prove. Some of these affidavits were made by expert detectives who state that they had been employed by defendant to discover evidence, if any they could, relative to his defense. Two of them swear that they located Maud Bennett in Pittsburg; that she stated that some man who had been living with her in Pittsburg set fire to defendant's store, but that, at another interview had with her, she declined to make any further statement. Such affidavits are entirely too flimsy and uncertain to justify the setting aside of a verdict, otherwise apparently just. The judgment will be affirmed.

*Affirmed.*