THE COAST NATIONAL BANK, A BODY CORPORATE, PLAINTIFF-RESPONDENT, v. PETER BLOOM, DEFEND-ANT-APPELLANT.

Submitted May 25, 1934—Decided September 27, 1934.

For the appellant, *Walter Carson.*

For the respondent, *Howard Ewart.*

The opinion of the court was delivered by

HEHER, J. There was a judgment for plaintiff, based upon the findings and determination of Judge Lawrence (who tried the issue without a jury), in an action upon a promissory note, dated June 26th, 1931, in the sum of $1,500, made by defendant to it.

Defendant appeals, and his grounds of appeal present, in substance, the following questions, viz.: (1) Is appellant's relation to the respondent bank that of an accommodation maker merely, or is his promise supported by a valuable consideration, and is, therefore, an obligation binding upon him and enforceable by the receiver of the bank? (2) Was there "a breach and frustration of" the agreement between appellant and the bank which discharged the former's obligation? and (3) Had the obligation contemplated by the parties matured?

The essential findings of fact follow: Appellant was the owner of five shares of the capital stock of the respondent bank, and was a member of its board of directors. On April 1st, 1931, a federal bank examiner, following an examination of the bank's books, reported to the Comptroller of the Currency that the "capital, surplus and profits" had been exhausted by a depreciation in the bank's bond account. A conference between the bank's president, a committee of its board of directors and the chief bank examiner was followed by a meeting of the board of directors at which the members, including appellant, "were given to understand that they were either liable for the depreciation or that they would be required to provide a special reserve fund to protect the bond account." Judge Lawrence further found that, "while it was not stated that the bank would otherwise have to close, it is a fair inference from the evidence that its financial condition was sufficiently critical to make the provision of such a fund not only advisable but necessary, in the interest of depositors, creditors and stockholders." Our examination of the proofs satisfies us that, in the absence of adequate corrective measures, the bank would have been closed by departmental order, and that the bank's officers so understood. The

capital, surplus and undivided profits having been wiped out by depreciation in the bank's assets, it could not have continued business with safety to the public, and it is fairly inferable that, in that situation, the federal officers in charge would not have permitted it to do so.

Accordingly, the directors agreed, with the approval of the federal bank department, to increase the capital assets of the bank to the extent of $13,000, and, pursuant thereto, they deposited with the bank, between April 27th, 1931, and July 13th following, the above mentioned sum, partly in cash (to the extent of $9,000, the contribution of six directors), and partly in promissory notes made by the remaining three directors, in the aggregate sum of $4,000, including the one in suit. The fund thus created, so the trial judge found, was entered "on a saving fund record of the bank as 'special reserve deposits for depreciation,' with the apparent understanding among the individual members of the board that when the bond account returned to a market value which would no longer impair 'capital, surplus and profits,' the several sums advanced by the directors would be returned to them with four per cent. interest." This indicated, in the opinion of the trial judge, "that the promissory notes given by defendant and other directors should be subject to discount or negotiation, to the end that the reserve fund should be liquid and readily answer the purpose for which it was set up." As a matter of fact, these notes were discounted by the bank, and the proceeds credited (in the name of the maker of the note) to the mentioned special reserve fund, and the notes were subsequently discounted by the Federal Reserve Bank, and used as collateral. The discount, in the first instance, was paid by the maker. Appellant's note was later returned by the reserve bank. It should be observed, in passing, that appellant testified that "when the bonds would come back to the book value," his money was to be returned with interest; and that if there were no such appreciation, "each and every one who had put up cash would have lost his cash or would have been liable for the amount of cash and notes * * *."

After the creation of this reserve fund, the bank continued

to function, and on August 4th, 1931, one Sims and associates purchased the capital stock held by the directors, including appellant's shares, for $150 per share, under an agreement that provided, *inter alia,* that the directors would tender their resignations as such, to take effect when the consideration price for the stock was paid, and "the special reserve fund deposited by the directors amounting to $13,000 has been returned with accumulated interest to the several directors." The respondent bank apparently was not a party to this agreement, and it did not at any time become bound to return the fund except upon the happening of the contingency first-mentioned. Sims and his associates, it would seem, paid the consideration price for the capital stock held by the directors, for these shares were subsequently assigned to them, and they assumed the management of the bank. The old board of directors, by reason of the disqualification resulting from the assignment of all their shareholdings, ceased to be directors of the bank. But the special reserve fund remained intact, and none of it was returned to the retiring directors.

The new management failed in its effort to re-establish the bank as a solvent institution, and, on January 13th, 1932, it was declared insolvent, and a receiver appointed by the comptroller proceeded to effect liquidation. There was no appreciation of the bonds, and the receiver asserts title to the special reserve fund and the promissory notes in question as assets of the bank to be used in the liquidating process.

In these circumstances, appellant's promise was supported by a valuable consideration, and a binding and enforceable obligation thereby came into being. He was not an accommodation maker within the intendment of section 29 of the Uniform Negotiable Instruments act. 3 *Comp. Stat., p.* 3738. Admittedly, the capital and surplus had been exhausted. Undoubtedly, the federal agents in charge of national bank supervision conceived it to be necessary to effect a replenishment of the capital fund, or to close the institution. This is an inescapable inference. The corrective measure proposed was the deposit of the specified sum, either in cash or enforceable promissory obligations, to be used,

through the discount formula, in lieu of cash until the obligations thus evidenced were satisfied by payment or extinguished by the equivalence of the market and the book values of the securities. This was designed to place the bank in a solvent condition, and to enable it to continue business with safety to the depositors, and those who might thereafter assume that status. The public interest would not otherwise be subserved.

Appellant insists that the president of the bank, in conveying what was evidently an ultimatum from the chief bank examiner, said the directors were liable for the loss resulting from the depreciation of the securities, and he gave his note assuming that to be so. It may well be that appellant was conscious of an obligation in the premises, arising from negligence, either of commission or omission, in the management of the bank, and that he was thus influenced to assume the obligation in question. But be that as it may, it is manifest that other considerations impelled him to contribute his share to the re-establishment of the bank on a solvent basis. He was a director of the institution, and, quite conceivably, he was vitally interested in the continued operation, on a solvent basis, of the bank for whose management, in that capacity, he was responsible. He and his associate directors were obviously seeking to avert the disaster of a closed bank —the hardships, harassments, destruction of confidence and loss to depositors and stockholders that are its inevitable accompaniments. Moreover, he was a stockholder, and while his stockholdings were small, this measure was calculated to maintain the value of his stock. It had that effect, for shortly thereafter he disposed of his stock for $150 per share. And if liquidation ensued, and there was a deficit, which was then, in all human likelihood, a certainty, he would be liable to an assessment to the extent of the par value of his stock.

There was, therefore, evidence to support the finding that some benefit accrued to appellant from the making of the promise in question, and this constituted a consideration within the accepted definition of the term. The directors who gave their notes secured a tangible benefit which accrued

directly from the contract. The requirement ordinarily stated for the sufficiency of consideration to support a promise is, in substance, a detriment incurred by the promisee, or a benefit received by the promisor, at the request of the promisor. *Broad Street National Bank* v. *Collier,* 112 *N. J. L.* 41; 169 *Atl. Rep.* 552; *Conover* v. *Stillwell,* 34 *N. J. L.* 54; *Williston on Contracts,* § 102. Consideration is, in effect, the price bargained for and paid for a promise. It may be given to the promisor or to some other person, or by the promisee or by some other person. It matters not from whom the consideration moves or to whom it goes. If it is bargained for as the exchange for the promise, the promise is not gratuitous. 1 *Contracts A. L. I.,* § 75; *Williston on Contracts, pp.* 193, 197, 235, *et seq.* Appellant here indisputably gained an advantage—one that he sought as the price for his promise. This, as Professor Williston said, is a sufficient reason for enforcing the promise. *Williston on Contracts,* § 102. He conceived that the continued operation of the bank on a solvent basis would redound to his advantage. He therefore derived a benefit sufficient as a consideration to support the promise. The extent to which appellant was benefited is immaterial. A very slight advantage to one party, or a trifling inconvenience to the other, is a sufficient consideration to support a contract when made by a person of good capacity, who is not at the time under the influence of any fraud, imposition or mistake. *Traphagen* v. *Voorhees,* 44 *N. J. Eq.* 21, 31. Whatever consideration a promisor assents to as the price of his promise is legally sufficient consideration. Legal sufficiency does not depend upon the comparative economic value of the consideration and of what is promised in return. 1 *Contracts A. L. I.,* §§ 76, 81. This is manifestly not a case, as contended by appellant, where the promisor gave himself consideration for his own promise. *Williston on Contracts,* § 102a. Appellant, therefore, was not an accommodation maker. The statutory test is whether he received value for the instrument, rather than for the lending of his name. *Morris County Brick Co.* v. *Austin,* 79 *N. J. L.* 273; *Messmore* v. *Meyer,* 56 *Id.* 31; *Carr* v. *Wainwright,* 43 *Fed Rep.* (2d) 507.

The apposite principle was applied in *Utah National Bank* v. *Nelson,* 38 *Utah* 169; 111 *Pac. Rep.* 907; *State Bank of Pittsburgh* v. *Kirk,* 216 *Pa.* 452; 65 *Atl. Rep.* 932; *New* v. *Page,* 144 *Md.* 606; 125 *Atl. Rep.* 403. In *Union Bank of Brooklyn* v. *Sullivan,* 214 *N. Y.* 332; 108 *N. E. Rep.* 558, the Court of Appeals of New York held, in a case in which the directors of a bank gave their note for a sum sufficient to cover the amount of worthless paper, which otherwise would have been charged to its apparent surplus, that a benefit sufficient to constitute an adequate consideration accrued directly from the contract, in that "each share of stock which they held represented an aliquot part of the bank's assets, and whatever increased the assets benefited the holders of the stock." We are not prepared to subscribe to the doctrine, nor is it necessary to consider it in the determination of the issue here presented, that a mere *pro tanto* increase in the value of the capital stock, resulting from a contribution to the corporation's capital fund, constitutes a consideration sufficient to support such a promissory obligation. This was not the case here. Appellant concededly did not bargain for a mere quantitative enhancement of the worth of his stock, to the extent of an aliquot part of the contribution to the reserve fund, as the price for his promise. This was not within the contemplation of the parties. The benefits that accrued to him, as a stockholder, were the maintenance of the value of his stock against the impairment resulting from the depreciation of the securities, and the consequent avoidance of an assessment to meet a probable deficit, by averting liquidation at a time when, due to the unprecedented trade depression, and the accompanying radical reductions in security values— in many instances a total market paralysis, with a consequent apparent destruction of values altogether—that process would have probably resulted in total loss to the stockholders, and, in addition, an assessment upon their stock, as well as a partial loss to the depositors.

Furthermore, this was a common enterprise, and it is obvious that the directors who made their contributions in cash would not have done so unless appellant and his asso-

ciates, who gave their promissory notes, had each promised to contribute a like sum to the fund in question. Therefore, the making of these cash contributions was a consideration for appellant's promise. And it should not be overlooked, in this connection, that this transaction, through the discounting of the note, took the form of a loan by the bank to appellant, who, in turn, contributed the proceeds to the fund. It is elementary that mutual promises are sufficient consideration one for the other. They are reciprocal considerations for each other. Here there was performance by the directors who made their contributions in cash without the medium of a discounted note, and this was an adequate consideration to support appellant's promise. *Williston on Contracts,* §§ 106, 117.

As to the second and third points, it is contended that "an implied term of said agreement was that the bank should hold said bonds and continue to do business, and that the sale of said bonds and the closing of the bank constituted a breach and frustration of said agreement, and that, in consequence thereof, the plaintiff has no legal right to enforce payment of the note." The argument seems to be that a reasonable time for appreciation of the securities must have elapsed before a cause of action on the note accrued, and that the receivership made it "impossible for the bank to perform its promise" in this regard. But this was clearly not an implied condition of the contract. The parties did not contemplate that the bond account should remain frozen, awaiting the day of equality between the market and the book values. In fact, some of the securities were pledged with a Philadelphia bank, as security for a loan to the respondent bank, and these were sold by the pledgee, after the appointment of the receiver, to realize the amount due on the obligation. Moreover, it was a contribution to the capital fund to avert a closing and receivership, and it likewise was not within the contemplation of the parties that, if and when the day of misfortune should come, liquidation would be deferred indefinitely awaiting an appreciation of the securities. It is evident that, in that situation, this fund was to be instantly

available for the payment of the bank's obligations, in the liquidation process. Incidentally, it is conceded that from the time of the giving of the note until the trial of the issue herein, a period of more than two years, the depreciation in the securities continued. It results that the judgment must be affirmed.

Judgment affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, CASE, BODINE, HEHER, PERSKIE, VAN BUSKIRK, HETFIELD, DEAR, WELLS, JJ. 12.

*For reversal*—DONGES, KAYS, JJ. 2.