EMORY TYLER *and* H. L. ARNOLD, *Executors v.* E. B. REYNOLDS *et al.*

(No. 8669)

Submitted March 22, 1938. Decided June 14, 1938.

*Poffenbarger & Poffenbarger,* for appellants.

*Harry K. Drane* and *Emory Tyler* and *Martin, Seibert & Beall,* for appellees.

MAXWELL, PRESIDENT:

This is an appeal from a decree of the circuit court of Mineral County and involves certain items in the settlement of the estate of F. M. Reynolds, deceased. The appellants are G. H. Reynolds and E. B. Reynolds, sons of the decedent and devisees under his will, and E. B. Reynolds as one of the three executors of the will. The other two executors are Emory Tyler and Harry L. Arnold, plaintiffs in this cause and appellees on this appeal.

Judge F. M. Reynolds died testate September 23, 1931. Since his death involvement, delay and litigation have attended his estate. Most of the affairs of the estate were before this court in 1935. *In Re F. M. Reynolds Estate,* 116 W. Va. 249, 180 S. E. 6. That writ of error centered in a report of the commissioner of accounts of Mineral County to whom the estate had been referred by the county court. The supplemental report of the commissioner was confirmed by the county court, and, on writ of error, the circuit court of that county, by order of November 26, 1934, affirmed the county court's action. On writ of error prosecuted in this court by E. B. Reynolds, Jessie K. Reynolds, Nina R. Clarskadon and G. H. Reynolds, children of the decedent and devisees under his will, we affirmed the circuit court's order.

In May, 1934, while the reference was still pending before the commissioner of accounts, this chancery suit was instituted by Tyler and Arnold, two of the executors. The other executor, E. B. Reynolds, declined to

join with his co-executors as a plaintiff in the suit. For some months after the institution of this suit, it remained inactive, and, within that period, the commissioner of accounts made his report to the county court which affirmed the same, and the circuit court, by order of November 26, 1934, affirmed the county court. Thereafter, in August, 1935, an order of reference was entered herein. One of the basic purposes of this suit is to subject the F. M. Reynolds real estate to sale for the liquidation of debts.

The requirements placed on the commissioner in chancery by the order of reference were, in no small degree, repetitious of ascertainment which had already been made in the county court proceeding and affirmed by the circuit court and ultimately affirmed by this court. However, some of the matters covered by the order of reference, as hereinafter particularized, are not duplicative of matters whereon findings have already been made. The fourth item of the order of reference required report of "debts said F. M. Reynolds owed at the time of his death, to whom they were payable, their nature, and their respective amounts and priorities, except that no testimony need be taken with reference to the debts found to be due, as affirmed by an order entered on the 26th day of November, 1934, and recorded in L. O. Book No. 14, at page 145, of the records of this court."

The points involved on this appeal are the chancellor's adjudications respecting the following matters:

(1) A note of F. M. Reynolds for $9,000.00, dated March 21, 1931, payable to The First National Bank of Keyser six months after date.

(2) A guaranty of Judge Reynolds under date of February 16, 1924, pertaining to certain notes of G. H. Reynolds, E. B. Reynolds and Jessie K. Reynolds, which notes, payable to The First National Bank of Keyser, did not carry the signature of F. M. Reynolds, as joint maker or endorser.

(3) A note for $25,000.00 executed by F. M. Reynolds

June 19, 1931, payable on or before two years after date to the order of The First National Bank of Keyser.

(4) "Music Hall" bonds in the sum of $19,000.00, claimed by the bank to have been pledged by Judge Reynolds as collateral security for the $25,000.00 note.

(5) A settlement of the trusteeship of F. M. Reynolds under the will of Eli Nine, deceased.

(6) The claim of Emory Tyler, one of the executors of the F. M. Reynolds will, for compensation for extra services rendered by him to the estate.

*Item One. The $9,000.00 note.* The commissioner in chancery heard much evidence respecting this note. He approved the claim on its merits and expressed the opinion in his report that the taking of evidence before him concerning the note was improper because the note already had been adjudicated as a debt against the estate. He calls attention to the fact that it was one of the debts allowed by the commissioner of accounts to whom the estate had been referred by the county court, and that his report had been affirmed by the circuit court and the Supreme Court of Appeals. The finding of the commissioner in chancery in this particular was approved by the trial chancellor. In his opinion, the judge said: "The auditing of this debt is *res judicata* and the exception thereto is overruled."

The bank held another and older note in the sum of $9,000.00, the makers whereof were N. R. Carskadon, N. B. Carskadon, and F. M. Reynolds. By reason of credits which had been made thereon, this note is shown in the report of the commissioner of accounts as $8,700.00, with interest thereon from June 8, 1932. It is the theory of the appellants that these two notes represent the same debt, and "that the individual note of Judge Reynolds was given merely to strengthen or support the Carskadon note, and that both represent the same money." Of course, the giving of an individual note would in no wise strengthen an earlier note on which the same individual was one of the makers.

Since sensible men of affairs do not ordinarily do vain and useless things, it is difficult to accept the view that the officials of The First National Bank of Keyser exacted from Judge Reynolds an additional note for the same debt, or that he would have participated in such fruitless action. The evidence relied on as tending to show that such inconsequential course was taken is conjectural. We are therefore of opinion that the commissioner of accounts in the first instance properly allowed both the Carskadon note, and the individual note now under attack; further, that the commissioner in chancery correctly allowed both of those items, and that the trial chancellor committed no error in holding that he would not consider the exceptions to the allowance of the individual note of $9,000.00, because the matter had been adjudicated in the manner hereinabove explained. Therefore, we affirm the trial court respecting the $9,000.00 note of March 21, 1931.

*Item Two. The guaranty of Judge Reynolds.* Under date of February 16, 1924, Judge Reynolds gave to the Board of Directors of The First National Bank of Keyser a written communication as follows:

"The purpose of this letter is to guarantee the payment of certain notes carried in the assets of your bank and executed by G. H. Reynolds, E. B. Reynolds and Jennie C. Reynolds.

"It appears that the total indebtedness of the three individuals named above, as evidenced by notes discounted by your bank, is Twenty Three Thousand and Thirty Dollars ($23,030.00) and that my name appears as endorser upon $6,300.00 of this amount. This letter is to guarantee the payment of the other items included amounting to $16,730.00 or any renewals of the notes now held by your bank, whether the renewals may be for like amounts as the items now carried or representing balances of present notes and for which renewals may be accepted.

"This guarantee to remain in force until all of the

items included in the total of liabilities indicated have been paid."

On the basis of the guaranty the commissioner of accounts made a finding that the estate of Judge Reynolds was indebted to the bank in the full amount of all the items designated in the guaranty. The items were presented separately by the commissioner in his report and were confirmed by the county court. On writ of error to the circuit court they were confirmed, and subsequently the order of the circuit court was affirmed by the Supreme Court of Appeals, as hereinabove recited.

Appellants take the position that it was error to adjudicate against the F. M. Reynolds estate these several guaranteed items without there first having been ascertainment that no part of the several debts, respectively, could be collected from those primarily liable therefor. Examination of the record does not disclose any evidence showing that none of the principals on the notes in question has any property which could be reduced to cash and applied at least *pro tanto* on this indebtedness. The pleadings, too, on this point are very meager. In this connection there is no allegation in the bill respecting the defendant, Jessie K. Reynolds, but as to the other children of the decedent there is the allegation that the residential properties they were separately occupying at the time of their father's death, title whereunto remained in him, would have to be sold because, among other reasons, "said F. M. Reynolds indorsed and guaranteed the notes of said devisees, E. B. Reynolds, G. H. Reynolds and Nina R. Carskadon, they and each of them having no property out of which said note as aforesaid can be paid." This allegation being inadequate as a basis on which to found adjudication of liability on the guaranty, there being no other allegation on the same point, and there being no evidence on that phase of the case, it would necessarily follow that the finding of liability against the F. M. Reynolds estate by reason of the guaranty is premature and unsupported by either pleading or proof, but for one overshadowing fact. That fact is that

the point has been adjudicated in like manner as the $9,000.00 note has been held to stand independent of any other debt. If question was to be raised respecting the regularity of adjudication of liability under the guaranty, that course should have been taken in the initial proceeding. The time for raising that question has passed. The matter is closed. We affirm the chancellor as to this item.

*Item Three. The $25,000.00 note.* In the circuit court this cause was heard and determined by the Honorable Decatur H. Rogers, Judge of the Twenty-Third Judicial Circuit, who rendered an able written opinion covering the different elements of the case. His discussion of the note under consideration is clear and forceful. We quote therefrom with approval:

"Judge Reynolds was the president, a director and the largest stockholder of The First National Bank of Keyser. At the examination of the bank made by the National bank examiner as of close of business on April 4, 1931, it was determined by said bank examiner that on the date of said examination, bonds and stocks owned by said bank had depreciated in the amount of $124,745.75, and as of May 13, 1931, said depreciation had increased to $155,628.13. This depreciation was sufficient to eliminate the reserve accounts, undivided profits and surplus fund and impair the capital of the bank to the extent of $83,422.71. By letter to the directors, under date of May 13, 1931, the Deputy Comptroller of the Currency notified them that: 'this impairment must be made good by the directors or other shareholders guaranteeing or purchasing an amount sufficient to do so or by a voluntary and unconditional cash contribution on their part in that amount, or in some other satisfactory manner; otherwise, it will be necessary for this office to issue a formal notice of impairment of capital with instructions to make the deficiency good by an assessment on the stock as required by law, or to place the association in voluntary liquidation.' With this letter was enclosed a form of a bond which, when executed by the directors of the bank,

would be a satisfactory compliance with the requirements of the Comptroller.

"This bond provided that an amount of cash or securities equal to the penalty of the bond should be placed in the bank under a deposit agreement therein provided for on or before June 1, 1933, or upon notice from the Comptroller of the Currency. At a conference had about this time in Baltimore between the representative of the Comptroller and the directors of the bank, they were advised that if the bond was executed, the Comptroller would within thirty days require the deposit of cash and securities in accordance with the deposit agreement contained in the bond.

"The bond, in the penalty of $85,000.00, was executed on May 23, 1931 by Judge Reynolds, and all the other directors of the bank, except H. C. Homan, who subsequently deposited $3,000.00 to be held under the deposit agreement, and H. G. Wilson; and between June 19th and July 21st, 1931, the amount of the bond either in cash or securities was deposited with the bank in compliance with the stipulations of the bond.

"The bond provided that the deposit thus made was to remain in said bank until liability under the bond was finally determined, any balance thereof not applied under the bond to be returned to the depositors.

"The bank was closed on March 6, 1933; on March 23, 1933, the depreciation in the bond account had increased to $309,000.00; on April 26, 1933, Joseph E. Patchett was appointed conservator; on April 29, 1933, the cash and collateral held under the deposit agreement was added to the assets of the bank under the instructions of Mr. Pollard, the representative of the Comptroller of the Currency. William McDonald was appointed Receiver of the bank on December 8, 1933. Mr. McDonald resigned and L. D. Lowther was appointed in his place. Upon Mr. Lowther's death, George S. Arnold was appointed and is still serving as Receiver.

"The assets of the bank, including the cash and securities taken under the deposit agreement, will not pay

its creditors. The cash and securities have been applied to the debts of the bank, except a $25,000.00 note made by Judge Reynolds. This note is the subject of serious contention in this case, and has been audited by the Commissioner as a debt against Judge Reynolds' estate.

"By mutual agreement in writing, executed simultaneously with the bond by the makers of the bond, entered into for the purpose of limiting their liability and for their mutual protection, the amount of liability of each of the signers of the bond, as between themselves, was fixed; it being agreed that Judge Reynolds' share of the liability was $35,560.00, that being in proportion to his stock ownership. In accordance with the terms of the bond and this agreement, he deposited with the bank on June 19, 1931, cash in the amount of $10,560.00 and his note for $25,000.00 due, with interest, on or before two years after date, * * * .

"This note was made in blank, as to the payee, but it was delivered by Judge Reynolds and deposited with the bank to be used in performance of the bond and the mutual agreement. His check that accompanied the note was payable to The First National Bank of Keyser, the receipt given at the time the check was given and the note deposited was signed by the Cashier of the bank, and the receipt given for the collateral was signed by the bank by its Cashier. All the contracts, the bonds and papers relative to the matter show that the note should have been similarly payable. The filling in of the blank with the name of the bank was in accordance with the implied understanding of all the parties. * * *

"The Comptroller of the Currency, having discovered the condition of the bank on April 4, 1931, had the statutory authority to require additional contributions to capital, voluntary assessment of shareholders or liquidation. U. S. R. S. Sec. 5205. His letter of May 13, 1931, was in pursuance of his authority under this statute, and the action of the directors was a compliance with the requirements of the Comptroller under this statute.

"The mutual stipulations and undertakings of the

makers of the bond are a sufficient consideration to support the contract if there was no other, and the bond is legal and binding upon the parties. (38 A. L. R. 881, 906.) All other obligors upon the bond have complied with their contract, and the estate of Judge Reynolds must do likewise. The depreciation of the bond account of the bank has not been and never will be recovered, the bank is hopelessly insolvent, a receiver is in charge of its affairs, its business is being wound up, its assets reduced to cash and distributed upon its indebtedness, and the corporation exists only for that purpose.

"The very condition against which the bond was given has occurred, and it is the duty of the Receiver of the bank to enforce the liability under the bond by appropriating the securities deposited under the deposit agreement to the debts of the bank in accordance with the method provided by the contracts and by having the note audited in this suit. The note of $25,000.00 is evidence of the amount of Judge Reynolds' share of the liability under the bond in accordance with the mutual agreement between the parties signatory to the bond, and is properly audited in this case as a debt."

There are ample authorities supporting the clear statement of the trial chancellor respecting the legal aspects of this transaction. A late case in point (1934) is *Coast National Bank* v. *Bloom,* 113 N. J. 597, 174 Atl. 576, 95 A. L. R. 528. In that case it is held that a note executed to a bank by one of its directors in conjunction with other officials of the bank, for the purpose of preserving the bank's financial integrity, is not an accommodation instrument; that such note is based on valuable consideration and constitutes a binding obligation. The court stated in this connection: "It is elementary that mutual promises are sufficient consideration one for the other. They are reciprocal considerations for each other. And here there was performance by the directors who made their contribution in cash without the medium of a discounted note, and this was an adequate consideration to support appellant's promise." Under the A. L. R. cita-

tion, *supra,* the *Bloom* case is annotated. In the annotation there appear many cases holding that a note or bond executed by bank directors or stockholders, to make good an impairment of the bank's assets, so that the bank may continue in business, is based on valid consideration.

Appellants lay great stress on the fact that the name of no payee appeared in the $25,000.00 note when it was executed and delivered by Judge Reynolds to the bank. They say that the record does not disclose that the name of The First National Bank of Keyser was inserted as payee before the death of Judge Reynolds, and that the implied authority of the holder of the note to insert the name of a payee terminated at the death of the maker. There is testimony in the record that the name of the payee was not inserted in the note before its delivery to the bank because Judge Reynolds and the other bank officials were uncertain what might be the requirement of the comptroller's office in that respect, and that the blank was left in the note until instructions could be received from that official. No one who testified on behalf of the bank has been able to fix with definiteness when the name of the payee was inserted. The whole matter of contribution by the makers of the bond was held in abeyance for several weeks awaiting Judge Reynolds to place his part of the undertaking on a basis which would be satisfactory to the others with whom he was standing in the undertaking to keep the bank open for business. With Judge Reynolds' portion of the undertaking being thus under close scrutiny by his associates, there is reduced to the vanishing point the probability that they would have approved what he was doing to meet his portion of the undertaking if the blank in his note had not been filled within the period of waiting. We think that the accompanying events not only indicate that it was proper for the note to be payable to the bank, but, further, that the name of the bank as payee was inserted within a few weeks, possibly within a few days, after the note was delivered to the bank. Obviously, the note was intended by Judge Reynolds to constitute a binding

obligation on him and his estate. On that background, and in the light of the attendant circumstances, the liability of the estate for the amount of the note with inter· est cannot be avoided by merely raising the point that maybe the name of the payee was not written into the note prior to the death of Judge Reynolds.

On the whole, therefore, we deem the $25,000.00 note a binding obligation on Judge Reynolds' estate. The chancellor is affirmed.

*Item Four.* *"Music Hall" bonds, $19,000.00, claimed by the bank as collateral security for the $25,000.00 note.* The real estate which secures the bonds or notes is situated in the City of Keyser and is referred to in the record as the "Music Hall". Hence the name which appears in the title of this item. The deed of trust was executed by Nina Reynolds Carskadon and Luther T. Carskadon, her husband, March 20, 1920, and secures three series of bonds or notes, each separate obligation being in the sum of $1,000.00; the first series aggregating $24,000.00; the second, $10,000.00; and the third, $22,000.00.

At the instant we are concerned with nine of the first series of bonds and all ten of the second series. These nineteen bonds were in the possession of the bank at Judge Reynolds' death and have subsequently been held by the receiver. The trial chancellor, in confirmation of the finding of the commissioner in chancery, decreed that these bonds had been deposited with the bank by Judge Reynolds as collateral security for the $25,000.00 note above described. The appellants draw in question the correctness of that finding and assert that these bonds or notes were not in fact deposited by Judge Reynolds with the bank for the purpose claimed by the bank and decreed by the chancellor.

In support of their challenge of the bank's claim in this particular, the appellants refer to the facts that the $25,000.00 note executed by Judge Reynolds is not in form a collateral note, and that it makes no reference to collateral security, and that the receipt executed by the cashier of the bank June 19, 1931, for cash in the sum of

$10,560.00 that day paid to the bank by Judge Reynolds and for the note of $25,000.00, makes no mention of collateral security for the note. The points thus urged by the appellants are persuasive but in no wise conclusive.

In support of its claim that these bonds are held by it as collateral security, the bank relies on a receipt which was found in Judge Reynolds' safety deposit box at the bank three or four years after his death. The receipt was written with a pencil and reads as follows: "July 18, 1931 received of F. M. Reynolds $9,000.00 1st lien bonds and $10,000.00 2nd lien bonds to be held as collateral for a note dated June 19, 1931, due two years after date. $19,000.00 Nina R. & L. T. Carskadon bonds. Signed First National Bank, Keyser, W. Va. H. L. Arnold, Cashier." Apropos of the alleged deposit of the bonds and the issuance of the receipt therefor, the bank's receiver offered in evidence the testimony of Harry L. Arnold and Joseph E. Patchett. Each of those two witnesses was a party signatory to the $85,000.00 bond above mentioned. Their liability under the bond might be increased if the F. M. Reynolds $25,000.00 note were devoid of collateral; hence, their personal interest in the inquiry respecting the alleged collateral security. Our statute, Code, 57-3-1, disqualifies any person interested in the event of a suit from testifying therein as a witness in regard to any personal transaction or communication between such witness and a person deceased at the time of such examination, against the estate of such decedent. By reason of the statute the appellants take the position that both Arnold and Patchett were disqualified to testify concerning the alleged collateral security under discussion. The substance of their testimony is that in their presence the receipt was delivered to Judge Reynolds at the bank on the day he turned in the "Music Hall" bonds as collateral. Mr. Patchett's testimony, a little more detailed than Mr. Arnold's, was objected to at the time it was given. Timely objection having thus been made, the Patchett testimony must be declared incompetent under the statute. But as to the Arnold testimony the

situation is different. There was no objection when the testimony was taken, nor thereafter in the trial court. "The competence of a witness to give material testimony may not be challenged for the first time in this court, but must be raised and passed upon in the trial court before it can be made the basis of an assignment of error here." *Willhide* v. *Biggs*, 118 W. Va. 160, 188 S. E. 876.

Not only does the Arnold testimony sustain the proposition of the depositing of the collateral bonds or notes by Judge Reynolds, as evidenced by the receipt, but the circumstances attendant upon the execution of the $85,-000.00 bond and the paying of a large amount of cash by Judge Reynolds' associates and co-obligors under the large bond, point unerringly to the strong probability that security for his note was expected and demanded. The closing of the matter seems to have been delayed until Judge Reynolds furnished collateral.

In the light of all the matters herein set forth we are of opinion that the trial chancellor committed no error in adjudging that the nineteen "Music Hall" bonds under discussion stand as collateral security for the $25,000.00 note.

*Item Five. The trusteeship of F. M. Reynolds under the will of Eli Nine, deceased.* Eli Nine died in March, 1920, and his will, with codicil thereto, was probated on the 17th of that month, F. M. Reynolds then qualifying as executor. Under Clause Four of the will, the share of his estate which he gave to his son, Carl Nine, was placed in the hands of a trustee, "and the income from his portion only shall be paid to him during his lifetime. If my said son Carl Nine should die without leaving children, then his part to revert to his brothers or their heirs. * * * I hereby appoint my friend F. M. Reynolds as trustee for my said son Carl and I grant to my said trustee or his successor power to sell and convey my son Carl's interest in the real estate." By codicil the testator provided: "Fourth: The trustee or any other trustee legally appointed in the place of the trustee named in the fourth clause of my said will shall have the power and

authority, if in his judgment it shall be wise or prudent to do so, (such trustee) in addition to paying to my son Carl Nine the income from his share in my estate, may pay him such part of the principal from time to time as the trustee may deem proper or the needs of my said son may seem to warrant. Whatever part of the share of my said son Carl may remain unexpended at his death shall be disposed of by the trustee as provided in the fourth clause of my will."

After the death of Eli Nine, Judge Reynolds promptly qualified as trustee under the Carl Nine spendthrift trust provision of the will. From the date of his qualification until his death about eleven years later, Judge Reynolds continued in the exercise of his duties as such trustee. He made several settlements before a commissioner of accounts of Mineral County.

Carl Nine died, leaving as the sole heir and distributee of his estate a son, Ogden W. Nine. By cross bill answer filed in this cause he seeks to surcharge and falsify Judge Reynolds' trusteeship accounts. The matter of these accounts was made a special item in the decree of reference in this cause. Under that requirement the commissioner in chancery recast the settlements which had been made by the trustee before a commissioner of accounts, as well as a settlement which had been made of the Nine matter by Judge Reynolds' executors. The commissioner found that there was error in the settlements in the amount of $651.88, and reported that such amount should be accounted for to Ogden W. Nine by the Reynolds estate over and above the amount disclosed by the settlements which had been made. On examination of the Nine matter the chancellor enlarged from $651.88 to $2,215.75 the amount due from the Reynolds estate under the Nine spendthrift trust, in addition to the amounts which had been recognized as due by Judge Reynolds and later, by the executors of his estate. Ogden W. Nine assigns error to the chancellor's finding and insists that a much larger amount should be

248

decreed as due him over and above the amount permitted by the executors.

The main grounds relied on by Ogden W. Nine involved, first, the charging by Judge Reynolds of a commission on the principal of the trusteeship funds, as well as upon the accretions thereto; and, second, the payment by the trustee to Carl Nine of substantial portions of the principal of the trusteeship funds.

Again, we quote approvingly from the opinion of the trial chancellor:

"Eli F. Nine died in March, 1920, and by his last will and testament appointed Judge Reynolds his executor and also devised and bequeathed the share of his son, Carl, to Judge Reynolds to hold the same in trust for Carl's life, the remainder to go to Carl's child or children. It is further provided by the will that said trustee or any other trustee legally appointed in the place of the trustee named shall have the power and authority, if in his judgment it should be wise or prudent to do so, in addition to paying Carl the income, to pay him such part of the principal from time to time as the trustee may deem proper or the needs of his said son may seem to warrant.

"Judge Reynolds, not only paid Carl the income, but under the authority given him by the will, paid Carl a part of the principal. He seems to have set Carl up in business twice, and both times, Carl failed. It is contended that this was an abuse of the discretion vested in the trustee. The will did not limit such disbursements to the need of Carl, but expressly authorized the trustee to also pay him a part of the principal 'if in his judgment it shall be wise and prudent to do so.' Mr. Nine could have given the property to his son absolutely. He could also give it to him only subject to the judgment of Judge Reynolds that the expenditures were wise and prudent. It is presumed that Judge Reynolds exercised the judgment required of him, and his estate is not now to be penalized because it may be supposed by some one that it was not wise and prudent to have expended a

part of the principal for the purposes for which it was used. There would have to be substantial evidence that he had failed to exercise the judgment required of him, and that evidence does not appear in the record.

"It is charged that the commissions allowed the trustee are excessive. It does appear from the record that the source of the property in the hands of the trustee was money and investments taken in kind from Judge Reynolds as executor of Eli Nine and money received from Judge Reynolds as Special Commissioner in a suit in which the real estate of Eli Nine was sold. There is also a $1,000.00 United States Government bond received from the estate of Carl Nine's mother in March, 1926. The trustee's sixth settlement refers to this as part of her dower, but her husband's will left her one-third of the real estate for life, and one-third of the personal property, absolutely. However, this also came through the hands of Judge Reynolds as Special Commissioner, in the suit of F. C. Nine et al. vs. R. W. Nine, et al.

"It is contended that as Judge Reynolds had received 5% commissions upon all of this property, either as executor or Special Commissioner, he could not charge and receive an additional commission as trustee. It is not sought to question the action of the Court in allowing the commissions to the Special Commissioner in the chancery cases in which he served. If those commissions were too large for the services rendered therein, they cannot now be attacked collaterally; nor is the attempt now made. It is simply contended that having been paid for his services, then he should serve as trustee for over ten years without additional compensation, except a commission on earned income. The commissions paid him as executor and as Special Commissioner were fully earned by him when he distributed the money in his hands and accounted for it. He fully performed the service required of him and he was paid. Why should he then undertake to serve as trustee of the estate of a man for his lifetime without any compensation whatever except upon earnings? If he had refused to serve and another

trustee had been appointed, it is not likely that it would be contended that the trustee would be required to receive, invest for the lifetime of a cestui que trust, and pay out a twenty thousand dollar fund for less than fifty dollars per year for his services. The purpose of the courts is to pay for services rendered. Usually, commissions of 5% on the amount received and paid out are allowed, but this is merely a 'rule of thumb' for the purpose of fixing the value of the services rendered. But a greater or less commission may be allowed; or the Court may allow a monthly or yearly salary, or a lump sum. The whole question before the Court is the value of the services rendered. *Mapp* v. *Hickman,* 164 Va. 386, 180 S. E. 296.

"This was no ordinary trust. Usually, a trustee merely invests funds in his hands, collects the income and pays it out as directed by the trust instrument; but Judge Reynolds was required to exercise a judgment in the expenditure of the principal of the estate, which the testator conceived his son lacked. It was not difficult for the trustee, when he undertook this trust, to foresee the relationship that he must, in the future, bear to his cestui que trust, and the position of authority and responsibility he must, in the future, take in deciding between the wishes and the best interest of the cestui que trust. Five per cent. commissions upon the property coming into Judge Reynolds' hands, both principal and income, and distributed by Judge Reynolds or his executors, would hardly compensate him for the services he has performed. This amount would be less than $150.00 per year during the existence of the trust, and is held by the Court, under the evidence, reasonable. 2 American Law of Administration, Sec. 532.

"The trustee's total collections were $27,836.08. Upon which, the commissions should have been $1,391.80. The commissions actually charged were $1,403.28, or an excess of $11.48."

Respecting other items of the trusteeship we find that the trial chancellor in written opinion has made a de-

tailed and searching analysis. For us to attempt a discussion of each item would protract this opinion to unjustifiable length. Suffice to say, our examination of the analysis of the chancellor does not disclose any item which we could say with assurance involves error. The account is complicated, and there may be items concerning which accountants might differ, but the findings which have been made are grounded on reasonable interpretation of the record, and, in our opinion, should not be disturbed. As to the Nine account we affirm the chancellor.

*Item Six. The claim of Emory Tyler, executor, for compensation for extra services.* Mr. Tyler is an experienced attorney of recognized ability and professional standing. He and his co-executors of the will of F. M. Reynolds, deceased, qualified for their office and entered upon the discharge of the duties thereof September 29, 1931. Since that date the three executors have received commissions in equal portions, each share being $762.32. With approval of his co-executor Arnold, but without the sanction of his co-executor Reynolds, Tyler has acted as attorney for the estate. His professional services have been rendered not only in connection with the prosecution of this suit, but also with relation to many matters which arose prior to its institution. The additional compensation which he seeks is for this extra service. In testimony before the commissioner in chancery, several members of the bar, familiar with the services performed by Mr. Tyler in connection with the Reynolds estate, valued his services variously from $1,000.00 to $2,500.00. The commissioner, on the basis of this testimony and his personal knowledge of petitioner's services, reported to the court that in his judgment there should be an extra allowance of $2,000.00. The circuit court expressed the opinion that the report of the commissioner as to the value of Mr. Tyler's legal services is fully sustained by the evidence, but being of the belief that additional compensation may not be made to an executor for legal services rendered by him for the estate, sustained excep-

tions to the commissioner's finding and disallowed the petitioner's claim.

There is sharp conflict of authority on the question of extra compensation to fiduciaries for special services performed by them, particularly legal services. Some courts have approved such allowances; others have flatly disapproved.

The trial chancellor, in disallowing this claim, quoted the English case of *Broughton* v. *Broughton*, 43 Eng. Reprint 831: "The result therefore is, that no person in whom fiduciary duties are vested shall make a profit of them by employing himself, because in doing this he cannot perform one part of his trust, namely, that of seeing that no improper charges are made." Following the excerpt from the English case, the trial chancellor stated: "While there is some conflict, the weight of authority is that if an executor, administrator or testamentary trustee, being, himself, a practicing attorney, elects to act as his own attorney in the performance of the legal services incident to the administration of the estate, he will not be entitled to an allowance against the estate for his professional services, in the absence of some statutory provision entitling him thereto." The chancellor's finding stands in general conformity with the following cases: *In Re Lankershim's Estate,* 6 Cal. 2d 568, 58 Pac. (2d) 1282; *In Re Parker's Estate,* 200 Cal. 132, 251 Pac. 907, 49 A. L. R. 1025; *Owen* v. *Stoner,* 148 Miss. 397, 114 So. 613; *Doss* v. *Stevens,* 13 Colo. App. 535, 59 Pac. 67; *Slusher* v. *Weller,* 151 Ky. 203, 151 S. W. 684; *Taylor* v. *Wright,* 93 Ind. 121; *In Re Carr's Estate,* 175 Cal. 387, 165 Pac. 958; *Willard* v. *Bassett,* 27 Ill. 37, 79 Am. Dec. 393.

In the succeeding cases, though the lines of approach have differed, additional compensation has been allowed to fiduciaries for legal services performed by them: *Holding* v. *Allen,* 150 Tenn. 669, 266 S. W. 772, 36 A. L. R. 743; *Pomeroy* v. *Mills,* 37 N. J. Eq. 578; *In Re Fisher's Will,* 159 Misc. 190, 287 N. Y. S. 252; *Nelson* v. *Schoonover,* 89 Kans. 779, 132 Pac. 1183; *In Re Leigh's Estate,*

196 Iowa 1102, 195 N. W. 1005; *In Re Ryan's Estate,* 117 *Wis.* 480, 94 N. W. 342; *In Re Mabley's Estate,* 74 Mich. 143, 41 N. W. 835; *In Re Wilson's Estate,* 83 Neb. 252, 119 N. W. 522; *Griffith's Estate,* 96 Pa. Super. Ct. Rep. 242; *Alexander* v. *Bates,* 127 Ala. 328, 28 So. 415; *Clark* v. *Knox,* 70 Ala. 607, 45 Am. Rep. 93. In the last case cited the Alabama court said: "When the executor or administrator is an attorney or solicitor, and in either capacity renders professional services, necessary in litigation for the benefit, or demanded by the necessities of the estate, he is entitled to compensation for such services. In such a case, the rule is not to allow him the usual professional charges for such service, but a compensation fixed and determined by the inquiry, what is fair and reasonable in view of all the circumstances of the estate."

In the cited case of *Pomeroy* v. *Mills,* it was stated in the opinion that an executor who is a counselor "cannot be allowed counsel fees aside from commissions, yet the fact that his professional skill has made it unnecessary to invoke other legal assistance may justly be regarded." In the case *In Re Fisher's Will,* the court held that for services "outside the executorial function", an executor is entitled to recover for legal services. In the case of *Griffith's Estate,* the Pennsylvania court was of opinion: "An executor who is also an attorney, and thereby has broadened the field of his activities in the settlement of the estate, should receive what his services are worth, irrespective of any particular designation which may be applied to such services."

Our statute provides: "The commissioner in stating and settling the account shall allow the fiduciary any reasonable expenses incurred by him as such; and also, except in cases in which it is otherwise provided, a reasonable compensation in the form of a commission on receipts or otherwise." Code, 44-4-14. This provision, taken from the Code of Virginia when this state was formed, has stood unchanged in the latter state, and has remained the unaltered provision of the Virginia statute

from at least as early as the Code of 1849. The statutory use of the expression "reasonable compensation" excludes the idea of a narrow or rigid basis for determining the proper remuneration to fiduciaries for their services. There must be taken into consideration the character, scope and efficiency of the services rendered; whether they were beneficial to the estate; and whether they were within or without the ordinary routine which would be expected of one serving in such capacity.

We have found no Virginia nor West Virginia case wherein there was presented a question of extra compensation to a personal representative for legal services, such as the claim here involved. However, several cases from the two states recognize the breadth of the statutes with reference to the allowance of compensation to fiduciaries, and have approved the fixing of compensation, under the statutes, on a basis commensurate with the services rendered. Commissions of five, seven and one-half, and ten per centum have been approved. Consult: *Fitzgerald* v. *Jones* (Va.), 1 Munf. 150; *Triplett's Executors* v. *Jameson* (Va.), 2 Munf. 242; *Cavendish* v. *Fleming* (Va.), 3 Munf. 198; *M'Call* v. *Peachy's Administrator* (Va.), 3 Munf. 288; *Jones* v. *Virginia Trust Co.,* 142 Va. 229, 128 S. E. 533; *Trotman* v. *Trotman,* 148 Va. 860, 139 S. E. 490; *Shepherd* v. *Hammond,* 3 W. Va. 484; *Estill & Eakle* v. *McClintic's Administrator,* 11 W. Va. 399; *Hoke* v. *Hoke,* 12 W. Va. 427; *Kester* v. *Lyon,* 40 W. Va. 161, 20 S. E. 933.

Under the West Virginia statute quoted; in the light of the Virginia and West Virginia cases cited in respect of the elasticity which prevails as to the fixing of compensation of fiduciaries; and not forgetful of the divergence of views expressed by courts of other states; we are of opinion that there does not obtain in this jurisdiction an iron-bound rule which prohibits the allowance of extra compensation to a fiduciary who has rendered useful and efficient legal service to the estate which he represents. We are impressed that a broadside inhibition against remuneration for such service would often

work injustice to the fiduciary and impose unnecessary burdens upon estates.

We do not look with favor on the charging of a legal fee by a fiduciary-lawyer in addition to commissions, and the evaluation of such legal services on the same basis of charges which would be made generally by lawyers for similar work, were they not themselves the fiduciaries involved in the legal proceedings. But we are of opinion that, within carefully circumscribed bounds always to be fixed and determined by the proper tribunal, extra services of a fiduciary-lawyer may be taken into account in the fixing of his compensation, whether, under the statute, the basis adopted be commission on receipts or some other appropriate basis. If the services were necessary and beneficial to the fiduciary estate and have been faithfully and efficiently performed, such facts should be taken into consideration in fixing the compensation of the person who rendered the services.

In the light of all that appears in the foregoing discussion of this item, we approve the circuit court's action in sustaining exceptions to the commissioner's allowance of $2,000.00 as a flat sum to Emory Tyler as attorney's fees in addition to regular commissions received and to be received by him as executor, but we do not approve the learned chancellor's action in rejecting in its entirety and unequivocally the claim of executor Tyler for extra remuneration. We do not concur in either the basis of allowance by the commissioner in chancery or the unqualified disallowance by the chancellor. Though, for the reasons we have stated, the chancellor was warranted in rejecting the finding of the commissioner in chancery, he was not for the same reasons warranted in disapproving entirely the Tyler claim. Therefore, we reverse the chancellor's holding respecting this item, so far as it wholly denies the Tyler claim, and remand this feature of the cause (being Item Six of this opinion) for further examination in the light of the principles herein set forth.

*Affirmed in part; reversed in part; remanded.*