STATE OF WEST VIRGINIA

*v.*

WILLIAM LYLE MICHAEL

(No. 10705)

Submitted April 19, 1955.        Decided May 31, 1955.

2

*Gray Silver, Archibald McDougall,* for plaintiff in error.

*John G. Fox,* Attorney General, *Harold A. Bangert, Jr.,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

In this criminal proceeding of State of West Virginia against William Lyle Michael, the defendant at the February, 1954, term of the Circuit Court of Berkeley County was indicted on the charge that "on the    day of January, 1954, and within twelve months prior to the finding of this indictment, in the said County of Berkeley, did unlawfully drive and operate a motor vehicle upon the public roads and streets of Berkeley County, West Virginia, while intoxicated and under the influence of intoxicating liquors, against the peace and dignity of the State." Upon the verdict of the jury, the defendant having made motions in arrest of judgment, and to set aside the verdict and grant a new trial, the Circuit Court of Berkeley County on April 1, 1954, overruled the motions, to which action of the court the defendant excepted. Thereupon the circuit court ordered that the defendant be confined in the county jail of Berkeley County for a period of sixty days, and that the State do recover of and from him a fine of fifty dollars and costs.

On Saturday evening, January 2, 1954, the defendant, William Lyle Michael, accompanied by his wife, Estelle Louise Michael, left their home, located about three miles

from Martinsburg, West Virginia, in defendant's pick-up truck, and drove with defendant at the wheel to Martinsburg. Arriving at Martinsburg, they attended a moving picture show, did some "window shopping", and then visited the club rooms of the Martinsburg Veterans of Foreign Wars, where defendant, while playing cards in the barroom of the club, drank four bottles of beer, defendant's wife remaining in a room outside the barroom in the company of friends.

About midnight defendant and his wife went to Carl's Restaurant in Martinsburg, where they had something to eat. The Michaels left the restaurant about two o'clock in the morning of January 3, 1954, and, with defendant driving, drove in a westerly direction from Martinsburg along State Route No. 9, known as the Hedgesville road, to meet friends, who were supposed to visit them at their home that morning. On the way, about two and a half miles out of Martinsburg, the pick-up truck which Michael was driving became involved in a serious accident, which resulted in injuries to both Michael and his wife. According to defendant, he was driving his truck at a speed of forty miles an hour, at a point in the road where the speed limit was fifty-five miles an hour. On topping a small hill around a curve in the road at a "no passing zone", indicated by a double white line, he noticed from the headlights thereon that an automobile was attempting to pass the truck from the rear. Defendant then noticed another car coming toward him, which car was a 1951 Chevrolet, owned by State's witness, Obert Orr, who likewise was injured, the car at the time being driven by Sarah Jane Orr, Obert Orr's wife. The Orr automobile collided with the pick-up truck of defendant, and as a result of the collision the Michaels and Obert Orr were injured. After attending to her husband, Mrs. Orr observed defendant lying behind the Orr car with his head on the hard surface of the road, his body on the grass, and his face down on the road. This witness also noticed that defendant's head was bleeding and that Mrs. Michael was standing in the

middle of the road near the white line, with her handbag in her hand and one shoe on the road near where she was standing.

Before any member of the department of public safety reached the scene of the collision, an ambulance had arrived, which took defendant and the Orrs to Kings Daughters Hospital in Martinsburg, with Obert Orr lying in the back of the ambulance, Mrs. Orr sitting nearby, and Michael lying in the middle compartment of the ambulance.

Shortly before the arrival of the ambulance, Mrs. Michael had been taken to the hospital by defendant's witness, Wayne Files, who, while driving along the Hedgesville road, reached the scene of the collision shortly after it occurred. At the hospital this witness had a nurse call an ambulance. Files testified that "She (Mrs. Michael) was bleeding and had blood all over her face."

Fourteen separate grounds of error are relied upon for reversal of the sentence of conviction, which grounds of error raise five primary questions: (1) Did the trial court err in refusing to sustain defendant's motion to dismiss the indictment, in refusing defendant's motion to strike out the evidence and direct a verdict for the defendant, on the ground that no crime known to the law of the State of West Virginia was charged in the indictment; (2) did the trial court err in overruling defendant's admission of evidence regarding a blood sample "and thereby refusing to determine the preliminary question of the admissibility (relevance) or the inadmissibility (irrelevance) of the evidence, which depended upon whether the sample could be proved to be a sample of the defendant's blood"; (3) did the trial court err in admitting and allowing to go to the jury, over the objection and exception of the defendant, evidence offered by the State regarding a blood sample and its analysis, which defendant states was not shown to be a sample of defendant's blood; (4) did the trial court err in eliciting in the presence of the jury evidence of a witness

as to the alcoholic content of the blood of persons "known" by the witness to be intoxicated; and (5) did the trial court err in allowing the case to go to the jury in the absence of evidence upon which the jury could properly find that defendant was intoxicated or under the influence of intoxicating liquor.

The other assignments of error are based upon the alleged error of the trial court in refusing to give defendant's instruction No. 8, defining the word "intoxicated" and failing to give any other proper instruction to the jury as to the meaning of either the word "intoxicated" or the phrase "under the influence of intoxicating liquor", after overruling defendant's motion to dismiss the indictment and after admitting evidence to show intoxication, and using the word "intoxicated" repeatedly in the court's examination of the laboratory technician, Mark B. Jacobs; in refusing to give defendant instruction No. 7, as offered, and in modifying it by striking out the words "intoxicated" and "while intoxicated", which the defendant asserts followed the description of the offense as charged in the indictment; in refusing defendant's instruction No. 12, which instructed the jury on the difference in the degree of proof required by law in civil and criminal cases, and on the principle that mere suspicion is not enough to justify conviction, an instruction which defendant asserts was peculiarly necessary in the circumstances of this case to avoid prejudice to the defendant; in giving State's instruction No. 1, over objection and exception of the defendant, to the effect that it was not necessary to prove that he was under the influence of intoxicating liquor; and in giving State's instruction No. 4, over the objection and exception of the defendant, instead of giving defendant's instruction No. 6.

The position of defendant's counsel on the question of the sufficiency of the indictment is "that the defendant here was charged in the indictment in the express words of a repealed statute, except that the charge was in the conjunctive instead of the disjunctive, and that, under

the circumstances, he was not charged with any crime, because the alleged offense, if any, was committed subsequently to the repeal of the statute." The indictment charges that the defendant "William Lyle Michael, on the    day of January, 1954, * * * did unlawfully drive and operate a motor vehicle upon the public roads and streets of Berkeley County, West Virginia, while intoxicated and under the influence of intoxicating liquors, against the peace and dignity of the State."

Specifically, counsel for the defendant asserts that the indictment in addition to using the words "* * * did unlawfully drive and operate a motor vehicle upon the public roads and streets * * * while intoxicated and under the influence of intoxicating liquors", taken from the old statute, Code, 17-8-25, as amended and reenacted by Chapter 115, Acts of the Legislature, Regular Session, 1949, which was repealed by Chapter 129, Acts of the Legislature, 1951, and ignoring the words of the new statute, Section 2, Article 5, Chapter 129, Acts of the Legislature, Regular Session, 1951, now contained in Michie's 1953 Cum. Supp. to the West Virginia Code of 1949, Anno., 17C-5-2: "* * * who is under the influence of intoxicating liquor * * * ", the Legislature by the enactment of the new statute also changed the words of the old statute contained in Acts of the Legislature, Regular Session, 1949, " * * * shall drive or operate" to provide that it shall be unlawful "* * * for any person who is under the influence of intoxicating liquor to drive or be in actual physical control of any vehicle on any highway of this state * * * ", which counsel for defendant asserts "further underlines the fact that the indictment, using the phrase, 'drive or operate', is drawn under the old and repealed statute and not" under Chapter 129, Acts of the Legislature, Regular Session, 1951, which was the statute at the time the instant indictment charged the defendant with having committed the crime for which he was convicted.

The indictment, however, contrary to the statement of

defendant's counsel, contained in defendant's brief, that the defendant did unlawfully "drive or operate", the motor vehicle, charges that the defendant "did unlawfully drive and operate a motor vehicle upon the public roads and streets of Berkeley, County, * * * while intoxicated and under the influence of intoxicating liquors". As the words "drive" and "operate", as applied to a motor vehicle are synonymous terms, the fact that the indictment employs the words "drive and operate" does not vitiate or render the indictment invalid, or does not indicate of itself that the indictment was drawn under the old statute. In *Ferguson v. State,* 198 Miss. 825, 23 So. 2d 687, 688, the Court held that the words " 'operate a motor vehicle' " include the driving of such motor vehicle. The fact also that the word "intoxicated" was inserted in the indictment in addition to the words "* * * under the influence of intoxicating liquor", employed in Section 2, Article 5, Acts of the Legislature, 1951, in our opinion, does not indicate that the indictment, as counsel for defendant asserts, does not charge a crime, for, in our opinion, the word "intoxicated" and the words "under the influence of intoxicating liquor" are likewise synonymous. *Taylor v. Joyce,* 4 Cal. App. (2d) 612, 41 P. 2d 967, 968; *Buck v. Maddock,* 167, Ill. 219, 47 N. E. 208, 209; *Compton v. State,* 133 Tex. Cr. Rep. 211, 109 S. W. 2d 761, 762; *Smith* v. *Baker,* 14 Cal. App. 2d 10, 57 P. 2d 960, 961.

We are, therefore, of opinion, and so hold, that the trial court did not err, as asserted by counsel for defendant in defendant's assignments of error Nos. 1 and 2, and in his brief and oral argument, in refusing to sustain defendant's motion to strike out the evidence and direct a verdict for the defendant on the ground that the indictment did not charge a crime within the statutory or common law prevailing in this jurisdiction.

Defendant's assignments of error Nos. 3 and 4 are based upon the narrow postulate that the trial court erred in admitting the evidence as to the sample of de-

fendant's blood, because it was not shown that the sample of blood, concerning which State's witness, Mark B. Jacobs, director of the laboratory at Kings Daughters Hospital in Martinsburg, was permitted to testify in chief on direct examination conducted by the Prosecuting Attorney of Berkeley County. Though at the trial one of counsel for the defendant indicated that he would raise in the trial court the question whether the taking of blood from the defendant and the testimony offered by the State and admitted by the court in regard thereto was an unconstitutional invasion of defendant's person, this constitutional question was not specially raised in the trial court by objection to the evidence, or as a ground of the motion to set aside the verdict, or in this Court in the assignments of error, the briefs and oral arguments of counsel. There is nothing in the statutory law of this State, concerning the taking of blood samples and the introduction of evidence relating thereto; but even if there were the constitutionality of a law which does not involve the jurisdiction of this Court, or the trial court, must be raised in the trial court. 1 M. J., Appeal and Error, Section 83; *Hulvey* v. *Roberts,* 106 Va. 189, 55 S. E. 585. Where the constitutional question, as in this case, was not raised specifically in the trial court or in this Court, and the decision of the question is not necessary to the decision of the case, this Court will not *ex mero motu* consider the question.

At this point, however, it may be well to invite the attention of the Bar to the fact that there is a wide conflict in the case law of this country on the question whether in a criminal case the introduction of evidence concerning a sample of defendant's blood, where the evidence bears on the question whether the crime for which defendant was indicted and convicted was committed by defendant while he was intoxicated, violates the defendant's constitutional rights. In this latter regard see generally 58 Am. Jur., Witnesses, Sections 40 and 67, and 1954 Cum. Supp. to Volume 58 Am. Jur., Section 67;

*Kuroske v. Aetna Life Ins. Co. of Hartford, Connecticut,*
234 Wis. 394, 291 N. W. 384, 127 A. L. R. 1505, Anno.
1513, 1520; *State* v. *Cram,* 176 Ore. 577, 160 P. 2d 283,
167 A. L. R. 952; *Green Lake County* v. *Domes,* 247 Wis.
90, 18 N. W. 2d 348, 159 A. L. R. 204, Anno. 209, 227.
See also State of *South Carolina* v. *Taylor,* 213 S. C. 330,
49 S. E. 2d 289, 16 A. L. R. 2d 1317, Anno. 1322-1328,
and 20 Am. Jur., Evidence, Section 351, on the question
of the right of the state to require a defendant in a crim-
inal case to demonstrate his voice for purposes of identi-
fication. It may, however, be noted at this point that
evidence as to the voice of a defendant in a criminal
case, as well as evidence as to finger prints, bears on the
identity of a person as distinguished from the question,
as here, whether the defendant committed the crime for
which he was tried and convicted. See also the illum-
inating article by Dean T. P. Hardman, 48 W. Va. Law.
Rev. 37, as to the admissibility of evidence concerning lie
tests; and for a discussion of the admissibility in evidence
of the results of blood tests to determine the paternity of
a child, see 44 Am. Jur., Rape, Section 71, and 20 Am.
Jur., Evidence, Section 352.

That it was the duty of the trial court in the first
instance to pass on the preliminary question of the
authenticity and integrity of the sample of blood, pur-
portedly that of defendant, before permitting evidence
concerning the "blood test" to be admitted, is based
upon a postulate well established in most, if not all, of
the American jurisdictions. The rule is aptly stated
in 1 Elliott on Evidence, Section 29, "* * * as a general
rule, questions of the competency of witnesses and the
admissibility of evidence are deemed to be questions of
law for the court. And they are also for the court to
decide, even when they depend upon the existence or
non-existence of disputed facts." See also 1 Elliott on
Evidence, Section 28; 9 Wigmore on Evidence, 3d Ed.,
Section 2550. But this record discloses that the trial
court did perform its duty, the assigned error is that the

court erred in admitting the evidence and in permitting expert testimony relating to the sample of blood.

Whether the trial court committed reversible error in admitting the evidence concerning the blood sample and its analysis depends upon the question, which is one for the court under the foregoing authorities, whether the sample of blood admitted in evidence was that of the defendant. If it was not, the evidence was inadmissible under the holding of this Court in the case of *Billy v. Powell*, 133 W. Va. 278, 55 S. E. 2d 889, 896, in which this Court by dictum held that the evidence of a test of blood, purportedly taken from the body of a plaintiff in a civil action, which defendant claimed demonstrated that plaintiff was intoxicated at the time he was injured, was inadmissible, "* * * because there was no evidence tending to show that the blood tested was that of plaintiff."

The foregoing discussion brings us immediately to the question whether the sample of blood was properly shown to be defendant's blood. The evidence bearing on the identity of the blood sample is contained in the testimony of State's witnesses, Grace Marie Hill, a registered nurse and night supervisor at Kings Daughters Hospital in Martinsburg, and Dr. Mark B. Jacobs, laboratory technician at the hospital. The former testified that on the night Michael was brought to the hospital after he was injured, she was working on the night shift from eleven o'clock p. m. on January 2, 1954, until seven o'clock a. m. on January 3, 1954; and that she took a sample of blood from defendant's body at the suggestion of a member of the West Virginia Department of Public Safety and with the consent of Dr. Andrew Zepp, who treated defendant in the emergency room of the hospital shortly after his admission in the early morning of Sunday, January 3, 1954, and who visited the defendant about ten or eleven o'clock that morning, once or twice on the following Monday, and then again on Tuesday morning, when he ordered that defendant be discharged from the hospital.

·The nurse, Grace Marie Hill, testified concerning what she did with the sample of blood, after taking it from defendant's body, as follows:

"Q.    What did you do with it after you took it from him?

"A.    Put it in a test tube and put it in the refrigerator for Mr. Jacobs to pick up later that morning.

"Q.    Did you do anything to identify it?

"A.    Labeled it.

"Q.    What did you put on the label?

"A.    His name."

On cross-examination this witness testified that after she obtained the blood sample from defendant's body, she placed the blood in a test tube, which was put in the refrigerator, located in the laboratory on the first hall, or ground floor, of the hospital. She further testified that the floor on which the laboratory was located has two doors, used by the public, which open out to the street; that there was no lock on the laboratory door, nor on the door of the refrigerator; that located in the laboratory was all of the hospital's laboratory and X-ray equipment, and that all "out-patients" treated are X-rayed in that room and all personnel of the hospital had access to the room; and that after she left the blood sample in the refrigerator she did not see it again.

Dr. Jacobs testified that on Sunday, January 3, 1954, he was called by telephone and asked to come to the hospital to examine "a specimen of blood down there to be examined for blood alcohol"; that he obtained a sample of blood from the refrigerator; and that he found the "Blood sample was in a test tube usually used for collecting this type of blood. * * * It was in that type of tube sitting in a small wine glass and on the wine glass was the name, William Michaels for blood alcohol analysis, with the doctor's name on it, which at that time was Dr.

Zepp. That was the way the blood was sitting in the refrigerator." Then witness testified on direct examination that he took blood sample to his own laboratory for examination, as the hospital did not have the facilities for "that type of analysis". This witness further testified that he picked up the blood sample at approximately a quarter of ten on the morning of January 3, 1954, and completed the analysis some time after twelve o'clock on that day. On cross-examination this witness testified that no one at the hospital handed him the blood sample or identified it for him; that, acting on instructions which he had received from the hospital, evidently through the telephone operator, he went to the hospital; and that when he got to the hospital he opened the refrigerator and found the sample in the usual place, where he was accustomed to find samples of blood, which had been taken by someone else.

Counsel for defendant assert that Grace Marie Hill's testimony is to the effect that when she placed the test tube in the refrigerator for Dr. Jacobs to pick up that morning, she labelled *the test tube with defendant's name*, and that when Dr. Jacobs found the test tube, evidently the only one in the refrigerator assigned to him, he found it labelled in a wine glass, bearing the legend of defendant's name and the name of Dr. Zepp. We, however, believe there is some merit in the attorney general's contention that Grace Marie Hill did not testify that she placed the label on the test tube. In the first two of the heretofore quoted questions addressed to the witness by the prosecuting attorney and the answers thereto, the word "it" is used in both questions and answers, and in no case is that word used in the questions and answers in reference to either the "test tube" or the "wine glass". By the first quoted question, the witness was asked, "What did you do with it after you took it from him", to which she replied, "Put it [the blood taken from the defendant's body] in a test tube and put it [the blood] in the refrigerator for Mr. Jacobs to pick up that morning." By the second question the witness was asked,

"What did you do [if] anything to identify it [the blood]", to which the witness answered, "Labeled it", evidently referring again to the sample of blood taken from defendant's body.

Aside from this we note, as suggested in the brief filed by the attorney general, that this record discloses that the normal hospital procedure followed in the Kings Daughters Hospital in Martinsburg was followed in the matter of maintaining the continuity of possession, or rather the authenticity or integrity of blood taken from a patient by some authorized person other than Dr. Jacobs, for the purpose of having the blood tested by the latter.

Unlike the blood sample offered in evidence in the case of *Billy v. Powell, supra,* in which the record contained no evidence that the blood sample analyzed by Sergeant Shanholzer of the Department of Public Safety of West Virginia, and offered in evidence for the purpose of showing that the plaintiff in the *Billy* case was under the influence of intoxicating liquor, or was intoxicated, was the blood of the plaintiff in that case, the continuity of the possession of the instant sample of blood from the time it was placed in the refrigerator by the nurse, Grace Marie Hill, until it was removed therefrom for analysis by Dr. Jacobs that morning, was established by positive and uncontradicted evidence sufficient to have justified the admission of the evidence by the eminent Judge of the Circuit Court of Berkeley County; and even if the evidence bearing on the authenticity or integrity of the blood sample was contained in a disputed question of fact, it was the duty of the trial court to solve that question, for questions of the competency of witnesses and the admissibility of evidence, as stated in 1 Elliott on Evidence, Section 29, are generally questions of law for the court, "* * * even when they depend upon the existence or non-existence of disputed facts."

We perceive no prejudicial error, as asserted in defendant's fifth assignment of error, which is to the effect

that the trial court erred in eliciting on the court's examination of Dr. Jacobs, who, the fifth assignment of error asserts was an unqualified witness, testimony concerning the alcoholic content of the blood of persons "known" by the witness to be "intoxicated". On direct examination, cross-examination and re-direct examination Dr. Jacobs testified *inter alia* that the sample of blood which he obtained from the refrigerator in the laboratory of the hospital showed an alcoholic content of .125 per cent, or 125 milligrams, which on re-direct examination the witness, in answer to the question: ".125 wouldn't be an ordinary amount, would it", replied, "It is abnormal." Then on being asked: "It is excessive", witness answered, "I can't answer that." Also in answer to the question directed to him on cross-examination, "Is there such a test to show what a lethal dose of alcohol would be in the system", the witness replied, "A lethal dose of alcohol does not depend entirely upon the blood alcohol. A good deal depends upon the age, weight and condition of the patient. A small person, might be able to take much less alcohol than a larger person and yet have a higher blood alcohol." This testimony was introduced by the State on the State's re-direct examination of Dr. Jacobs without objection on the part of defendant's counsel, and then immediately after the prosecuting attorney and counsel for the defendant had completed the examination of Dr. Jacobs on direct examination, cross-examination and re-direct examination, the trial court proceeded to examine the witness; and it is this examination upon which defendant's counsel based the fifth ground of error. Before this examination of the witness, however, the court, at the close of the witness's direct examination by the prosecuting attorney, inquired of the witness, "Dr. Jacobs, have you had any education or educational experience that would qualify you to express an opinion as to whether or not a person would be under the influence of intoxicants if his blood showed a certain percentage of alcohol", to which Dr. Jacobs replied, "I don't think that falls within my power to estimate that."

Nevertheless, after counsel had completed the direct examination, cross-examination and re-direct examination of the witness, the court directed a number of questions to the witness about the amount of alcohol he had found in the blood of persons whom the witness knew to be intoxicated or under the influence of intoxicants, to one of which questions the witness answered, "I have found them as low as 100, but I wouldn't call them intoxicated at that point".

The court's examination of Dr. Jacobs was not designed to and did not elicit from the witness an opinion as to what alcoholic content was necessary to render a person intoxicated or under the influence of intoxicating liquor; but the examination was directed simply to facts within the knowledge of the witness concerning persons whom he knew to be intoxicated, and the results of witness's analyses of the blood of those persons for alcoholic content. Though the trial court pressed its examination of Dr. Jacobs and was somewhat persistent in an evident effort to elicit answers from the witness, the error in that regard, if any, will not be considered by this Court on this writ of error. No objection or exception was made by counsel for the defendant to the examination of Dr. Jacobs by the trial court, and at the trial the court was not asked by counsel to rule on the admissibility of the testimony embraced in the court's examination.

Error in the admission of testimony, to which no objection was made, will not be considered by this Court on appeal or writ of error, but will be treated as waived. *Colebank v. Standard Garage Co.,* 75 W. Va. 389, 84 S. E. 1051; *Williams v. County Court,* 90 W. Va. 67, 110 S. E. 486; *Closterman v. Lubin,* 113 W. Va. 353, 167 S. E. 871; *Willhide v. Biggs,* 118 W. Va. 160, 188 S. E. 876; *Chesapeake and Ohio Ry. Co., v. Johnson,* 137 W. Va. 19, 69 S. E. 2d 393; *Davis v. Sargent,* 138 W. Va. 161, 78 S. E. 2d 217. In point 3 of the syllabus of *Willhide v. Biggs, supra,* this Court held that: "The competence of a witness to give material testimony may not be challenged for the

first time in this court, but must be raised and passed upon in the trial court before it can be made the basis of an assignment of error here. The West Virginia cases holding the contrary which are named in the body of this opinion are, in so far as they conflict herewith, expressly overruled."

This rule was later approved by this Court in *Lilly v. Bowling*, 120 W. Va. 169, 172, 197 S. E. 299; *Tyler and Arnold, Executors v. E. B. Reynolds*, 120 W. Va. 232, 246, 197 S. E. 735; *Carter v. Walker*, 121 W. Va. 81, 85, 1 S. E. 2d 483. This Court in adopting the rule of appellate procedure set forth in point 3 of the syllabus of *Willhide v. Biggs, supra,* overruled a number of earlier cases, among which was the case of *Poteet* v. *Imboden,* 77 W. Va. 570, 88 S. E. 1024, in point 2 of the syllabus of which this Court held: "Evidence which is wholly incompetent may be taken advantage of in an appellate court, whether objected to in the lower court or not", which followed the holding of the Supreme Court of Appeals of Virginia in *Fant v. Miller and Mayhew,* 17 Gratt. (58 Va.) 187. For an illuminating note commenting upon the ruling of this Court in the case of *Willhide v. Biggs, supra,* and setting forth in detail the trend of the decisions of this Court and the Supreme Court of Appeals of Virginia, prepared by Marlyn Edward Lugar, now a member of the faculty of law of West Virginia University, and Edward Wilson Eardley, Esq., see 43 W. Va. Law. Rev. 338, 339.

The foregoing disposes of all the questions preliminary to a consideration of the controlling question in this case, raised by defendant's assignment of error No. 6, which is to the effect that the trial court erred in submitting the case to the jury in the absence of evidence upon which the jury could properly have found that the defendant was intoxicated, or under the influence of intoxicating liquor.

With the exception of the two members of the Department of Public Safety of West Virginia, Troopers Russell

Pitzer and William F. Sankbeil, who were stationed at Martinsburg and who saw defendant after the collision for the first time at Kings Daughters Hospital in Martinsburg, and observing that defendant seemed to be intoxicated suggested that his blood be tested for alcoholic content, no witness who testified for the State, or for the defendant, gave any positive testimony that defendant was intoxicated or under the influence of intoxicating liquor.

Pitzer testified that when he first interviewed defendant for a statement, defendant's speech was so irregular that no statement could be obtained; that defendant asked the witness what had hapened, and he told witness that he owned a truck and that "He hit a car or something like that." Trooper Pitzer further testified that "He [the defendant] gave me the impression of being intoxicated, so I told him if he didn't get his clothes on and get to bed I was going to take him to jail", and that thereupon defendant put his clothes "on" and got into bed.

Trooper Sankbeil, who was with Pitzer at the time of the first interview with defendant, testified that when he saw defendant, defendant was standing, leaning against the bed, in the hospital. "He had his head bandaged a little bit, his eyes were very, very bloodshot, pupils dilated and with a glassy look, and he wanted his pants and wanted to go home. We tried to get him to bed and finally did. After we got him in bed, we left the hospital at that particular time and went out to the scene of the accident."

This record discloses, however, that as a result of the collision between the two cars the defendant received a severe physical shock, which resulted in a concussion of the brain of more or less intensity, a laceration on the head, and abrasions on the face. Mrs. Orr testified that after she had attended her husband, she observed defendant lying face down with his head on the hard surface

of the road, his body on the grass, and that his head was bleeding; but otherwise she did not notice anything unusual about defendant. Obert W. Orr, who also was severely injured, did not notice defendant at the scene of the accident.

Defendant's witness, Wayne Files, who arrived at the scene of the accident shortly after it occurred, testified that when he came within sight of the point of the collision, he noticed a man lying on the road, who, he later learned, was the defendant; that after spending some time in taking Mrs. Michael to the hospital and in stopping at a place in a vain effort to call an ambulance, he proceeded to the hospital, and, returning to the scene of the accident, he then found defendant lying in the same position that he was in when he left for the hospital. Defendant's witness, Ernest W. Frye, reached the place of the accident shortly after it happened, and there he was flagged to stop by Mrs. Michael, who pushed witness in the chest and said, " 'My husband, my husband' "; and, when defendant's witness, Wayne Files, after taking Mrs. Michael to the hospital, returned to the scene of the accident, defendant had started to arise from the position in which he was lying, and, according to the witness, "I knelt down beside him on one knee and put one knee back of him, and asked him if he was hurt bad, to see if he would say something. He said something I couldn't make out, as if he were in a daze." This witness further testified that all the time that he was at the scene of the accident, until Files returned from the hospital, defendant lay on his face and witness knelt down, and "I could hear him breathing." But as Files returned, defendant "rallied and raised up", and that is when witness raised defendant on his knee, and that the first conversation or sign of life he noticed in Michael was when Files returned from the hospital.

Perhaps, however, the best qualified witness as to whether defendant was intoxicated or under the influence of intoxicating liquor is Dr. Andrew Zepp, a prac-

ticing physician with three years' experience in the Army, who saw defendant shortly after his admission to the hospital. This witness testified that when he was able to get defendant, who theretofore had been in the hall outside the emergency room, into the emergency room, defendant was holding a handkerchief to the side of his head, and that upon removing the handkerchief Dr. Zepp found that defendant had a laceration of the scalp approximately two and a half inches long, which bled rather profusely, which witness ascertained by the blood on the handkerchief, with multiple abrasions about the face, and defendant complained of some pain in one thumb. Dr. Zepp testified that lacerations to the extent which he observed on defendant's head would evidence a head injury, "and the mildest type of head injury, of course, is a concussion without skull fracture." This witness further testified that defendant had some degree of concussion, the severity of which would be difficult for him to determine; that the symptoms of a concussion are loss of consciousness, then "a state of semi-coma, then into a period of disorientation, or haziness, or something of that nature, until finally they come all the way back, which may vary, the coma may last only seconds, or it may be a matter of a minute or two, to where they [evidently meaning patients suffering from concussion] pass back into a semi-conscious state, and usually literature describe that they have this amnesia, following the concussion, where they don't remember too much of the past incident." Dr. Zepp further testified that he had seen a few people under the influence of alcohol, and in answer to the question whether, while treating defendant in the early morning of the day of his entry into the hospital, "Was there anything in your observation of him, to his reactions, that would indicate intoxication, distinguished from the facts of concussion?", Dr. Zepp testified, "I was not impressed from my own examination and looking at the man, I was not impressed as to him having had any alcoholic beverages, that didn't enter my mind, to be perfectly honest with you."

Grace Marie Hill, the night supervisor, who assisted Dr. Zepp in dressing defendant's wounds, in neither her direct nor in her cross-examination expressed any opinion on the question whether defendant was intoxicated or under the influence of intoxicating liquor from the time he entered the hospital until she left about seven o'clock Sunday morning. She, however, testified that she noticed defendant, while he was in the hall outside the emergency room awaiting his turn for treatment, sitting on a bench in the hallway; that she remembered him getting up and walking around and then going back and sitting down, "He kept doing that repeatedly, but he generally always went back and sat down when we told him to"; and that defendant did not give her any trouble, so far as she could remember, except that when she and Dr. Zepp undertook to put defendant in bed, he would not take his clothes off, "that is the only time he refused to do anything."

The only evidence in this record bearing on the analysis of the sample of defendant's blood for alcoholic content, made by Dr. Jacobs, is the testimony of Dr. Jacobs and Dr. Zepp. Dr. Jacobs testified that an analysis of the blood of a normal person may show no alcoholic content to 50 milligrams, or .050 per cent, which constitutes a reducing agent found in the blood of normal persons, who have not taken alcohol internally, or by painting the skin with alcohol, or by injection into the blood stream; and that while .125 per cent or 125 milligrams of alcoholic content found in the sample of defendant's blood was "abnormal", witness said he could not testify whether that was an excessive amount of alcohol. Dr. Jacobs also testified that he had seen persons under the influence of alcohol with a blood test as low as one hundred milligrams, and that a lethal dose of alcohol is considered anything over 350 milligrams.

Dr. Zepp, in answer to the inquiry as to the general range of the effect of an increasing amount of alcohol on a person, testified, "Anything from 0 to 50 *milograms*

per one hundred cc of blood is considered, I believe by most of the tables I have consulted, as being negligible. From 50 *milograms* to 150 *milograms* per one hundred cc of blood is considered questionable, and anything over 150 *milograms* per one hundred cc of blood up to, approximately, 500 *milograms* per hundred cc of blood, the patient is in varying stages of more severe alcoholism or intoxication, and 500 *milograms* per one hundred cc of blood is getting awfully close to the fatal dose. Most tables I have consulted all have about the same figures"; and that the tables represent "the work which has been done over a large series of cases and they have compiled the information and set up this particular table and that is what they go by", which, the witness testified, is the result which "medical men" would generally rely upon.

Summarizing the evidence portrayed by this record, bearing directly upon the question whether there was sufficient evidence from which the jury could find beyond a reasonable doubt that defendant was intoxicated or under the influence of intoxicating liquor at the time of the collision, it may be stated: (1) That no witness, with the exception of the two members of the department of public safety, testified that defendant was intoxicated or under the influence of intoxicating liquor; (2) that State's witness, Sarah Jane Orr, an occupant of the car which collided with the defendant's pick-up truck, defendant's wife, Estelle Louise Michael, and defendant's witnesses, Wayne Files and Ernest W. Frye, testified without contradiction that as a result of the collision the defendant, suffering from a head injury, was seen in a prone position on or near the edge of the hard surface of the road, from which position he did not move, or was not removed, until about the time the ambulance arrived at the scene of the collision, which testimony is uncontradicted in this record; and none of the witnesses who saw the defendant at the scene of the accident gave any testimony which would indicate in the least that defendant was intoxicated or under the influence of intoxicating

liquor; (3) that the actions of the defendant in the emergency room of the hospital in the presence of the two members of the department of public safety were, according to Dr. Zepp, defendant's attending physician, similar to those of a person who had a concussion of the brain in some degree; (4) that the physician who attended the defendant, Dr. Zepp, testified without contradiction that the defendant had a concussion of the brain, and that such concussion, according to its severity, will result in loss of consciousness, a state of semi-coma, a period of disorientation or haziness, "or something of that nature", until finally the injured person may recover entirely; (5) State's witness, Grace Marie Hill, who as night supervisor was in charge of injured persons upon their admission to the emergency room, and who assisted Dr. Zepp in dressing defendant's lacerations and abrasions, was not asked by the State whether defendant was intoxicated at the time of his entry and while at the hospital, but her testimony was confined to defendant's action in the hall outside the emergency room and outside his hospital room, which at the most indicate restlessness, and on one occasion probably sheer contumacy; (6) Dr. Zepp expressly testified that during his examination and treatment of defendant, he was not impressed as to whether defendant had "had any intoxicating beverages"; (7) the fact that the laboratory technician, Dr. Jacobs, found that the blood sample of the defendant, which he analyzed, contained blood alcohol in the amount of .125 per cent or 125 milligrams, which Dr. Jacobs testified was abnormal, but he was unable to testify that it was "excessive"; and (8) that Dr. Zepp, a qualified and experienced physician, testified specifically that from 0 to .050 milligrams for one hundred cc of blood is considered negligible, and from 50 to 150 milligrams for 100 cc of blood "is considered questionable."

Axiomatic in the law governing the trial of criminal cases in this State is the postulate, from which this Court has never deviated, that in every criminal case the State

has the burden of establishing the defendant's guilt beyond a reasonable doubt. This rule, governing the criminal practice and procedure, is so firmly embedded in the case law of this State that no extensive citation of authority is required. See, however, *State v. Howard,* 137 W. Va. 519, 73 S. E. 2d 18; *State v. Comstock,* 137 W. Va. 152, 70 S. E. 2d 648; *State* v. *Mayle,* 136 W. Va. 936, 69 S. E. 2d 212; *State* v. *Tabet,* 136 W. Va. 239, 67 S. E. 2d 326; *State* v. *Hudson,* 128 W. Va. 655, 37 S. E. 2d 553, 163 A. L. R. 1265.

We, therefore, are of opinion, and so hold, that the evidence in this case is insufficient from which a jury could have properly found beyond a reasonable doubt that the defendant at the time he was driving his pick-up truck in the early morning of January 3, 1954, when it collided with the Orr automobile, was under the influence of intoxicating liquor within the meaning of Section 2, Article 5, Chapter 17C, Acts of the Legislature, Regular Session, 1951, now contained in Michie's 1953 Cum. Supp. to the West Virginia Code of 1949, 17C-5-2.

Because this case will be remanded to the Circuit Court of Berkeley County for a new trial, the Court should, at the risk of rendering this opinion prolix, address itself to defendant's other assignments of error.

Defendant's assignment of error No. 7 to the effect that the trial court erred in refusing to give defendant's instruction No. 8, defining the word "intoxicated" and failing to give any other instruction as to the meaning of the words "intoxicated" or "under the influence of intoxicating liquor", after overruling defendant's motion to dismiss the indictment, and after admitting evidence offered to show intoxication, and using the word "intoxicated" repeatedly in the court's examination of the laboratory technician, Dr. Mark B. Jacobs, we dispose of by simply holding that, as heretofore stated in this opinion, the words "intoxicated" and "under the influence of intoxicating liquor" are synonymous, and, there-

fore, there is no error in the trial court's holdings as set forth in this assignment of error.

Defendant's eighth assignment of error is to the effect that the trial court erred in refusing to give defendant's instruction No. 7, as offered, and in modifying it by striking out the words "intoxicated" and "while intoxicated", which instruction, as offered, the defendant asserts in assignment of error No. 8 faithfully followed the description of the offense as charged in the indictment. This assignment of error may be disposed of in view of the discussion hereinabove contained of defendant's motion to dismiss the indictment.

We are of the opinion that the trial court did not err, as asserted in defendant's assignment of error No. 9, in refusing defendant's instruction No. 12. This instruction contained the admonition to the jury: "And this degree of conviction only exists when the facts proved coincide with, and are legally sufficient to establish, the truth of the hypothesis assumed, namely, the guilt of the party accused, and are not inconsistent with any other hypotheses." The instruction was taken verbatim from the case of *State v. Gebhart,* 70 W. Va. 232, 73 S. E. 964, which is a case which involved circumstantial evidence. The judgment of conviction in the case at bar was based upon evidence which is largely, if not wholly, direct, positive, and oral. In point 6 of the syllabus of *State v. Wilson,* 74 W. Va. 772, 83 S. E. 44, this Court held: "In a case in which evidence is largely direct, positive and oral, prayers for instructions telling the jury they must acquit the prisoner, if there is any reasonable hypothesis consistent with his innocence, are properly denied; the rule being applicable only to issues dependent upon circumstantial evidence." The quoted language of defendant's instruction No. 12, in which defendant sought to have the jury instructed on the theory that this case involves circumstantial evidence, though the judgment of conviction was not based upon such evidence, justified the trial court in the refusal of the instruction.

The trial court did not err, as asserted in defendant's assignment of error No. 10, in giving to the jury State's instruction No. 1, which told the jury that it was not necessary to prove that the defendant was intoxicated, but only necessary to prove that he was under the influence of intoxicating liquor. In view of the synonymity of the words "intoxicated" and "under the influence of intoxicating liquor", the trial court properly gave that instruction.

Likewise the trial court did not err in giving State's instruction No. 4, instead of defendant's instruction No. 6, as asserted in defendant's assignment of error No. 11. Defendant's instruction No. 6, refused by the trial court, instructed the jury as to the necessity of the unanimity of the jurors and the law applicable thereto, but so did State's instruction No. 4. It is not error in this jurisdiction to refuse an instruction, where the matters contained therein are amply covered by another instruction given by the trial court.

The foregoing disposes of all of the specific assignments of error. Defendant's assignments of error Nos. 12, 13, 14, and 15 are general, and are heretofore fully discussed in the consideration of the other assignments of error.

For the foregoing reasons the judgment of the Circuit Court of Berkeley County is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*