483 S.E.2d 38

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Leeman JARVIS, Defendant Below, Appellant.**

**No. 23086.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 1996.

Decided Dec. 12, 1996.

Rehearing Denied Feb. 11, 1997.

---

James Wilson Douglas, Sutton, for Appellant.

William C. Martin, Prosecuting Attorney for Braxton County, Sutton, for Appellee.

ALBRIGHT, Justice:

Appellant, Leeman Jarvis, appeals [1] from an August 25, 1995 order of the Circuit Court of Braxton County, West Virginia.[2] That order denied his motion to set aside the verdict, his motion for a new trial, and his motion for judgment of acquittal. A jury convicted appellant of the second-degree murder of Deborah Meissner Jarvis, who was, at the time of her death, involved in a divorce action with appellant's son. Appellant contends the lower court erred in changing its position regarding the inclusion of lesser-included offenses of first-degree murder; in allowing the victim's divorce lawyer to testify; in admitting into evidence appellant's blood sample; in admitting DNA evidence regarding a blood stain on a leather coat found at the scene of the homicide; in admitting the leather coat into evidence; and in prohibiting the defense attorney from repeating questions on cross-examination. After reviewing the record, we conclude that the circuit court did not err; therefore, we affirm the second-degree murder conviction.

## FACTS

Deborah Meissner and Richard Jarvis were married on August 28, 1975. Richard Jarvis is appellant's son. One child, Catherine "Katie" Lynn Jarvis, was born to the marriage on July 26, 1983. The family owned a farm in Exchange, Braxton County,

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

2. Mr. Jarvis was indicted by the Circuit Court of Braxton County, West Virginia. Due to media coverage surrounding the homicide, he requested a change of venue for the trial, which was granted. The trial was held in Gilmer County, West Virginia.

West Virginia. A camper trailer was located ninety-two feet across the driveway from the farm house. Appellant lived in the camper trailer on a seasonal basis, generally during spring, summer, and autumn. The elder Jarvis had a home in Jersey City, New Jersey. The camper trailer had no plumbing conveniences and its only source of electricity was an electrical connection to the house. Appellant enjoyed access to the kitchen and bathroom facilities, as well as to the telephone, in the farm house.

Richard Jarvis returned to New Jersey to work in 1992, where he resided in his parents' home. The decedent, Deborah Jarvis, and the child, Katie, remained in West Virginia, where the decedent was employed as a teacher's aid at an early intervention program for children in Sutton, West Virginia. The decedent and Katie lived in the farm house.

At the time of her death, the decedent and Richard Jarvis were engaged in a bitter divorce proceeding. The decedent was granted temporary custody of Katie and was seeking permanent custody. Also, under the temporary decree, appellant was permitted to keep the camper trailer on the property and was allowed continued access to the house. At trial, there was testimony that the parties to the divorce action had reached an oral agreement regarding the distribution of property, although the family law master had not yet entered a recommended order. After the agreement was reached, the decedent became aware that her husband and appellant had disposed of a farm tractor which was marital property. Due to this alleged fraud, she petitioned the court, seeking to set aside the property settlement agreement. She requested that she be granted the entire farm, rather than the house and approximately one-half of the acreage. The petition was scheduled for hearing in early November, 1993. Richard Jarvis was seeking permanent custody of Katie.

On October 25, 1993, Katie awoke late for school and missed the school bus. Her mother drove her to Braxton Middle School, where classes commenced at 8:30 a.m. Katie testified that she arrived at school shortly before 8:15 a.m. The decedent was sched-uled to be at work by 9:00 a.m., but rather than going directly to work after dropping Katie off at school, she returned home. A couple of neighbors, Janet Tinney and Rev. Randy Hamrick, confirmed that they met her on the road as she was driving in the direction of her home. Her car was found parked at her house.

Appellant was observed leaving the premises at 9:30 a.m. by Elsie Shaver and Barbara Samples, both of whom testified at trial. Raymond Dodrill also testified that he observed appellant traveling toward Sutton at about 9:30 a.m.

When Katie arrived home from school later that afternoon, she found the house and her mother's car locked but was unable to find her mother. She found her mother's shoes and other items by the fish pond. She exchanged her shoes for her mother's shoes, and left her shoes, backpack, and clarinet by the fish pond. She then walked over a mile to the home of her best friend in order to seek help. Her friend's father, Carlos Brent Holmes, is a deputy sheriff in Braxton County. Deputy Holmes arrived home from work at approximately 4:30 p.m. and was advised of the situation. He went immediately to the Jarvis farm.

Upon arriving at the Jarvis farm, Deputy Holmes found the house was locked. He began walking around the house and found a leather jacket lying in the yard. One arm of the jacket was inside out and the ground underneath it was damp, as if the jacket had been pulled off and placed there before the morning dew evaporated. The deputy found the car locked and backed into place near the door. The decedent's house keys and car keys were never found.

Deputy Holmes found the decedent's body floating in the goldfish pond, which is located about ninety feet from the house. The goldfish pond is actually a small farm pond that was stocked with goldfish. Deputy Holmes waded into the water and recovered the body. He described the body as being very stiff when it was recovered and clothed only in jeans, socks, and a bra. Deputy Holmes took photographs of the body lying near the pond. A photograph was taken of the body

lying on its side, which showed a gap of several inches between the victim's stiff legs. This photograph was marked at trial as State's Exhibit 5.

Dr. Irvin Sopher, Chief Medical Examiner for the State of West Virginia, examined State's Exhibit 5. Dr. Sopher concluded the body was in a state of full rigor mortis at the time the photograph was taken. He testified that a body reaches full rigor mortis eight to ten hours after death. The doctor also testified that the decedent had five separate bruises under her scalp. It was his opinion that these bruises were not inflicted with a weapon, but were consistent with a fist fight. There were injuries to the neck that showed the decedent had been choked. There were multiple recent scratches, abrasions, and bruises about her head, arms, face, torso, and legs. Dr. Sopher was unable to state an opinion as to whether the decedent was unconscious when she went into the pond. He stated that blows to the head or choking could have rendered her unconscious, but not necessarily. Dr. Sopher was of the opinion that the decedent's assailant held her under the water causing her to drown or placed her in the water after she became unconscious causing her to drown.

Evidence gathered at the scene indicated a struggle had ensued. The mud on the victim's car had swipe marks down the side next to the house, as if someone or something had brushed along that side nearly the entire length. The victim's earring was broken and the glass portion was found under a leaf near the car. A matching earring, including a stud which matched the stud found on the body, but not the fastener, was located in the same area. The leather jacket was found a few feet from this area.

The leather jacket and the victim's clothing were sent to the State Police Forensic Laboratory for inspection and analysis. Two spots of human blood were found, one each on the leather jacket and the victim's jeans.

After the blood was discovered, Deputy Holmes collected blood samples from appellant, Richard Jarvis, and Wayne Mitchell Barker, the victim's boyfriend, to be used for comparison purposes. The samples were collected by taking the subjects to the local hospital, where a nurse drew blood samples into vacuum tubes in the presence of Deputy Holmes. The tubes were labeled and placed in styrofoam boxes sealed with tape. The samples of the two Jarvis men were drawn on a date earlier than that of Mr. Barker. Therefore, the Jarvis samples were stored in a drawer of the refrigerator in the deputies' office in the courthouse annex until the Barker sample was collected. The three samples were delivered at the same time to Trooper Bowles at the State Police Laboratory. The Medical Examiner's Office preserved a blood sample from the victim.

Trooper Howard Brent Myers of the State Police Laboratory did polymerase chain reaction (PCR) type DNA testing on the blood stains from the jacket and the jeans. Trooper Myers determined the blood stain on the jacket was consistent with the genetic markers of appellant and excluded it as having come from the victim. He determined the blood stain on the jeans was consistent with both the victim and her husband, Richard Jarvis. Because this test was inconclusive with respect to the depositor of the blood stain on the jeans, and to get a more conclusive analysis with respect to the depositor of the blood stain on the jacket, Trooper Myers recommended that additional testing be performed. Roche Biomedical Reference Laboratories (Roche) was engaged to do additional PCR-type DNA testing, as the State Police Laboratory was not qualified to do testing on sites other than DQ alpha.

All materials relating to the DNA tests, including the extracts prepared by the State Police Forensic Laboratory, the known blood samples, and the jacket and jeans sections, were sent to Roche. These materials were then forwarded to another private laboratory, Cellmark Diagnostics (Cellmark), at the request of appellant.

Marsha Eisenberg, the director of the forensic testing laboratory at Roche, testified that Roche did not consume any samples from the jacket in conducting their tests. Instead, they swabbed the surface of the leather with a sterile cotton swab saturated in sterile water in an attempt to soak up cells

from the surface. This procedure produced results. Roche tested the samples they collected, as well as the extract produced at the State Police Laboratory. The Roche analysis confirmed the blood stain on the jacket was consistent with the genetic markers of appellant and not of the victim, and the blood on the jeans was consistent with the genetic markers of the victim and none of the other comparison samples.

Paula Yates testified for Cellmark at trial. She testified that she attempted to obtain DNA from the leather jacket, but was unable to find any DNA.

Appellant was indicted by the grand jury during the June, 1994 term. During the investigation, the sheriff's department found that the decedent had attached a recording device to the telephone system in her house. The investigating officer testified about tape recordings in which appellant had threatened the decedent. Appellant made a motion to dismiss the indictment under the West Virginia Wiretapping and Electronic Surveillance Act.[3] Prior to the court ruling on the motion, the State presented the case to a second grand jury meeting at the October, 1994 term of court. No testimony relating to the tape recordings was presented. Both grand juries returned a murder indictment against appellant. At arraignment, appellant entered a not guilty plea.

The trial commenced on March 27, 1995. Appellant's suppression motion regarding the tapes was granted. At the close of the trial,

the jury found appellant guilty of the second-degree murder of Deborah Jarvis. Appellant filed a motion to set aside the verdict, a motion for a new trial, and a motion for judgment of acquittal on May 17, 1995. These motions were denied on August 25, 1995. It is from this order that appellant appeals.

### STANDARD OF REVIEW

"When this Court reviews challenges to the findings and conclusion of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard." Syllabus point 1, *McCormick v. Allstate Ins. Co.*, 197 W.Va. 415, 475 S.E.2d 507 (1996).

### DISCUSSION

■ Appellant contends the circuit court made a decision on April 20, 1995, as to the verdicts the jury would be permitted to consider.[4] At that time, the circuit court concluded that the jury would consider only the verdicts of murder in the first degree or not guilty. On April 21, 1995, the court reversed its decision and announced that the jury would be permitted to consider the possible verdicts of murder in the first degree, murder in the second degree, voluntary manslaughter, and not guilty.[5] Appellant then

---

**3.** West Virginia Code § 62–1D–1, *et seq.*

**4.** The court concluded its remarks regarding this issue by stating:

I will entertain an instruction as to one of two possible verdicts, guilty or not guilty—guilty of first degree murder or not guilty.
I am not going to offer the possibility of second or voluntary and involuntary.
First degree is the only option that's available.

**5.** Among the court's remarks on April 21, 1995, were the following:

The defendant, of course, has denied guilt, and the question of the facts and circumstances surrounding the death is, I think, an issue that the jury should consider. The question of whether there was premeditation is something that the jury could or might be able to determine from the facts and circumstances presented in the evidence.

The question of whether there was malice is something that the jury might determine from the evidence; that is, from the facts and circumstances reflected in the evidence.

If the Court in this instance excludes the possibility of second degree murder and it excludes the possibility of voluntary manslaughter, the Court in effect removes from the consideration of the jury any deliberation and considerations of the facts and circumstances involved here, and I believe that it would be error on my part to do that.

\*   \*   \*   \*   \*   \*

I apologize for the fact that my decision has changed, but I am under the obligation to attempt to present the jury an opportunity to consider the evidence that has been presented, and the Court is of the opinion that I was incorrect in the ruling that I made yesterday.

requested an instruction on involuntary manslaughter. The State did not resist the request, and the jury was so instructed.

In considering the point raised by appellant, we note that in *State v. Wallace*, 175 W.Va. 663, 337 S.E.2d 321 (1985), this Court concluded that "a defendant does not have the right to preclude the State from seeking a lesser included offense instruction where it is determined that the offense is legally lesser included and that such an instruction is warranted by the evidence." *Id.* at 667, 337 S.E.2d at 325–26.

As we read the evidence, it clearly is sufficient to show that the decedent died as a result of a homicide, an intentional killing, for no justifiable reason and without provocation. The evidence appears to be sufficient to show that appellant was the perpetrator of the crime. A jury would be justified in concluding that the crime occurred at a place and at a time when no one other than appellant and the victim were present. All other persons who conceivably had a motive, primarily Richard Jarvis, appeared to have been elsewhere. Appellant was observed leaving the scene shortly after the crime was thought to have occurred. The evidence would permit a jury to conclude that appellant's blood was found on the victim's clothes found at the scene of the crime. Evidence was introduced tending to show that appellant had a motive for killing the victim. Appellant had also expressed malice toward the victim in his comments to the neighbors.[6]

While we appreciate that appellant, incident to the April 20, 1995 ruling of the trial court limiting the verdicts to guilty of first degree murder or not guilty, desired to avoid the giving of "lesser included offenses" instructions, he certainly was advised by the State's position, announced that day, that the State desired the instructions. We likewise assume that appellant's counsel anticipated, prior to trial, that lesser included offenses could be an issue in the trial and might even serve appellant's interests. We have no doubt that appellant's testimony may have been helpful with respect to those lesser theories, but we cannot conclude that appellant was unduly surprised by the trial court's later change of opinion. We are led to that conclusion, in part, because earlier the trial court had announced an intention to rethink the issue at a later stage in the proceedings. To the extent that the trial court's change in its first ruling on lesser included offenses constituted surprise, we also anticipate that, if asked, the trial court would permit any reasonable recess and would have entertained a motion to reopen the appellant's case. We find no request in the record for a continuance or motion to reopen appellant's case. Notwithstanding the failure to request a recess or move to reopen, appellant argues that he should be granted a new trial on the basis of this Court's holding in *Dietz v. Legursky*, 188 W.Va. 526, 425 S.E.2d 202 (1992).

However, in reading *Dietz*, we find the facts there are very different from the facts we now have before us. In *Dietz*, during *voir dire* "the trial judge stated that the appellant, in claiming self-defense 'will state that the decedent did threaten to attack and attacked him in such a way as to require him to defend himself....'" *Id.* at 528, 425 S.E.2d at 204. Trial counsel objected, arguing that the judge's statement implied that appellant would take the stand, when he had the right not to testify. The judge responded that he would declare a mistrial if appellant did not testify. Appellant did not testify, but the judge failed to declare a mistrial. This Court reversed and remanded for a new trial, holding that it was reversible error for the trial court not to declare a mistrial when the court promised a mistrial would be declared if the defendant did not testify. We do not have similar facts before us.

Unlike *Dietz*, the court in the case at bar made no unequivocal statement regarding

---

6. First and second degree murder is defined in W.Va.Code § 61–2–1 (1991), which states, in pertinent part:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

its future intentions; the court made it clear that the issue of lesser included offenses would be resolved after the close of the evidence. Without objection or further inquiry regarding this open question, appellant proceeded to offer and close the defense case, also making at that time his decision not to testify. We cannot say that the trial court committed any error where it appears that appellant did not inform the court that a further ruling on lesser included offenses was required before appellant concluded his defense testimony. We also note that other trial tactics may have contributed to the decision not to testify, such as a fear that appellant's testimony might invite the State to introduce tape recordings, earlier suppressed, which might have aided the State in proving premeditation and obtaining a verdict of guilty of murder in the first degree.

As noted above, the trial court, deeming itself in error in first ruling that it would instruct only on first degree murder, amended its ruling the next day, April 21, 1995, by announcing that the jury should be instructed as to murder in the first and second degree and voluntary manslaughter. Appellant then requested that the jury also be instructed as to the lesser included offense of involuntary manslaughter. The State did not resist this request, and the jury was so instructed.

We welcome the efforts of trial courts to correct errors they perceive before judgment is entered and while the adverse effects can be mitigated or abrogated. Here, we agree with the State that the circuit court did not err in correcting its own mistake and in instructing the jury as to the lesser included offenses of first degree murder.

■ Appellant complains further that the lower court erred in permitting the decedent's divorce attorney, Harley Stollings, to testify when Richard Jarvis, the administrator of the decedent's estate, invoked the attorney-client privilege, purportedly acting for decedent's interests. Appellant contends confidential communications between an at-

torney and client are privileged against mandatory disclosure, and this applies not only to the client, but also to the personal representatives of the client, citing *State v. Douglass*, 20 W.Va. 770 (1882).

We do not find *Douglass* helpful. In this early case, this Court eloquently spoke to the broad reach of the attorney-client privilege, perhaps to a reach beyond its application today. Moreover, the net result of the case was to permit the introduction of evidence obtained as a probable result of the violation of that confidence. Finally, we see in *Douglass* no support for appellant's claim, in effect, that the personal representative of the client may claim the attorney-client privilege for the benefit of a third party.

Here, appellant complains that Mr. Stollings testified about the personal feelings of his client toward appellant and about alleged disagreements and contentiousness between them. We find nothing in the Stollings testimony that could properly be described as a violation of client confidence.

■ Introduction of evidence asserted to be subject to the attorney-client privilege is governed by Rule 501 of the West Virginia Rules of Evidence.[7] In syllabus point 7 of *State ex rel. United States Fidelity and Guaranty Co. v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995), this Court detailed the requirements for asserting the privilege:

> "In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from that attorney in his capacity as a legal adviser; (3) the communication between the attorney and client must be identified to be confidential." Syllabus Point 2, *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979).

Mr. Stollings testified to matters in the divorce case that had not been reduced to writing and to the legal effect of documents that were introduced into evidence, especially

---

7. Rule 501 of the West Virginia Rules of Evidence states: "The privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law except as modified by the Constitution of the United States or West Virginia, statute or court rule."

the petition to set aside the property settlement agreement. The decedent and Richard Jarvis had entered into an oral property settlement agreement before the family law master at a hearing on September 7, 1995. The agreement had never been reduced to writing and, therefore, there was no document to introduce into evidence. Mr. Stollings' testimony related to these essentially public matters. Mr. Stollings' testimony also related to the disposition of marital property of the victim and her estranged husband ordered in proceedings before a family law master on June 25, 1995, for which an order had not been entered at the time of the victim's death. The State contended that the disposition ordered by the family law master played a part in the murder case.

It appears that Mr. Stollings did not testify as to any private conversations between himself and the decedent identified as confidential. Rather, his testimony related to the fact that a divorce was pending between the decedent and Richard Jarvis, to the orders issued by the family law master relating to marital property, and to a petition that had been filed to set aside the property settlement agreement and the effect that petition would have had on the agreement if the relief requested had been granted. Finally, we note that appellant has no standing to claim the privilege for the benefit of a third party.

■ Appellant contends the lower court erred in admitting into evidence his blood sample, State's Exhibit # 49. He complains that the integrity of the blood specimen was not preserved and there existed a substantial opportunity for tampering, because this fungible item was stored in an unsecured refrigerator where deputy sheriffs stored food items. Appellant relies on *State v. Michael*, 141 W.Va. 1, 87 S.E.2d 595 (1955), a case concerned with the admissibility of a blood sample in which the defendant questioned whether the sample admitted into evidence was his, and it was not shown that the director of the laboratory at the hospital, the State's witness, was permitted to testify in chief on direct examination. However, the nurse who took the blood sample testified that she placed the sample in a test tube and placed the test tube in a laboratory refrigerator, which was located on the ground floor of the hospital. The ground floor had two doors which were used by the public and opened onto the street. Neither the refrigerator nor the laboratory door contained a lock. The nurse did not see the sample after she placed it into the refrigerator. The next morning, a doctor was called to come to the hospital to examine the blood specimen for blood alcohol. Evidence regarding the results of that examination was admitted into evidence by the trial court. This Court held that the trial court did not err, finding that normal hospital procedure had been followed as to the continuity of possession and "even if the evidence bearing on the authenticity or integrity of the blood sample was contained in a disputed question of fact, it was the duty of the trial court to solve that question...." *Id.* at 14, 87 S.E.2d at 602–03.

In the case at bar, the testimony elicited at trial showed that the blood sample was collected by a nurse at the local hospital in a vacuum tube. The vacuum seals were intact when the tubes were taken to the laboratory. Each tube of blood taken from each donor was labeled by the nurse when the blood was drawn. Protective seals were placed over the caps on the tubes after the blood was drawn. These seals were still intact when the tubes were taken to the laboratory. The tubes were placed in individual styrofoam boxes after they had been sealed. Those boxes were in turn sealed with tape and placed in a cardboard container, which was placed in a drawer of the refrigerator, separate from the other contents of the refrigerator.

The refrigerator was located in a room that was the office for law enforcement officers of the Braxton County Sheriff's Department. It is on the third floor of the Braxton County Courthouse Annex. The public can enter this office, but they cannot do so when it is unattended. Unless attended by at least one deputy sheriff, the office is kept locked.

We find that the integrity of the blood sample of appellant was preserved by the unbroken seals and that there was no likelihood of tampering. Moreover, expert testimony at trial indicated that for DNA testing purposes, test results of a blood sample is not

altered by contamination with materials other than human DNA and that the effect of contamination by other materials is to prevent usable results being obtained from the tests. In the case here, test results were obtained and offered in testimony. We find no merit in the argument of error.

■ Appellant complains that the lower court erred by admitting expert DNA testimony, when the piece of the leather coat from which the blood sample upon which the resulting DNA opinion was based had been consumed. He complains that laboratory protocols were not shown to have been followed and photographs of the procedure were not taken. He relies on *State v. Thomas,* 187 W.Va. 686, 421 S.E.2d 227 (1992), in contending he was effectively deprived of meaningful cross-examination, confrontation, and due process of law.

The State argues that the only point during the examination at which any of the bloodstain sample was destroyed was in the initial testing at the State Police Forensic Laboratory. Trooper Myers took a small portion of the bloodstain and immersed it in detergent to release the DNA. The State preserved the amplified DNA produced at the State Police Forensic Laboratory, which was delivered to Cellmark, appellant's independent laboratory. Cellmark could have performed genotyping tests to see if they obtained the same results. However, they chose not to do so.

The testing completed by the State's independent laboratory, Roche, did not consume the bloodstained leather from the jacket. The State gave Roche explicit instructions that they could not consume the sample in their testing. Roche obtained their sample by swabbing the leather pieces with sterile water on a cotton swab. Roche retained their extract and offered to make this extract available to Cellmark for testing, if Cellmark or appellant so desired. Dr. Eisenberg, who testified at trial for Roche, was of the opinion that her laboratory could have extracted additional DNA from the remaining leather cuttings if the laboratory was allowed to consume the samples.

Before trial, the leather cuttings were delivered to Cellmark. The record indicates that appellant's counsel was advised by Cellmark that the laboratory's examination revealed no material from which a DNA fingerprint could be taken. Counsel for appellant explained that Cellmark had informed him that a polymerase chain reaction (PCR) test could be performed, but that the test would consume the remaining clippings. The State stated they had no objection to the samples being consumed for that testing. The court granted permission for Cellmark to perform their testing. Paula Yates, who did the testing for Cellmark, testified she was unable to extract any detectable DNA from the leather to test.

■ The basic rule regarding complicated tests and consumption of evidence is contained in syllabus point 4 of *State v. Thomas, supra,* which states:

When the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts.

In the case at bar, it appears material for testing by Cellmark was preserved. We recognize that Cellmark stated it was not able to perform the PCR testing due to a lack of detectable DNA. Nonetheless, this alleged error fails on the second requirement of *Thomas* that "the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts." Appellant has made no showing that the State failed to preserve documentation of the tests made by its experts and, therefore, has made no showing that the defendant and his experts were unable to conduct a full and fair examination of the results by reviewing adequate documentation of the State's test of the leather.

■ Appellant further contends that the lower court committed error by admitting into evidence the leather coat found in the decedent's yard on the day of her death. Appellant alleges there was no proper showing of authentication, in that the coat was not positively identified as belonging to the dece-

dent and the coat was not connected to the decedent on the date of her death. Appellant also complains Deputy Holmes did not mark the jacket with his initials or other identifying symbol in order to establish authenticity or to demonstrate a chain of evidence.

We find no merit in these arguments. Rule 901(a) of the West Virginia Rules of Evidence states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evidence was adduced showing that the coat was found in the yard behind the decedent's house. This is the area where it appears that a struggle may have taken place between the perpetrator and the decedent. The jacket was found with one sleeve turned inside out, suggesting that it may have been pulled off during a struggle. The victim's body was not clothed with a blouse or coat when her body was found floating in the pond. The victim was the only resident of her dwelling who owned such a jacket, and witnesses testified the jacket was like one owned by the decedent.

Deputy Holmes admitted that he did not place an identification mark on the jacket when he took it into custody; however, he testified that he kept it in his sole custody until it was delivered to Trooper Bowles at the State Police Forensic Laboratory. At that time, Trooper Bowles placed his identification mark on the coat. We find that the trial court did not abuse its discretion in ruling the jacket had been adequately identified and the chain of custody was properly established.

Lastly, appellant contends the lower court erred by interrupting the cross-examinations of witnesses and preventing appellant from repeating questions at strategic points critical to his defense. He argues these interferences were so pervasive as to amount to a denial of due process and a substantial hindrance to the confrontation and cross-examination of major State witnesses.

Rule 611(a) of the West Virginia Rules of Evidence states:

The court shall exercise reasonable control over the mode and order of interrogat-

ing witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Because appellant does not direct us to specific instances in which the trial court's conduct under Rule 611(a) created prejudice to his case, we have reviewed the entire record in an effort to ascertain if the court's conduct was unwarranted or so substantially interfered with appellant's case as to create prejudicial error. We note that in a substantial number of the instances about which appellant apparently complains, there is no indication in the record that the witnesses failed to understand counsel's prior questions. In all of the circumstances surrounding the conduct of the trial judge about which the appellant complains, we do not find that the trial judge abused the discretion conferred on him by Rule 611(a) of the Rules of Evidence.

For the reasons assigned, we find no prejudicial error in the proceedings below and, therefore, affirm the order appealed.

Affirmed.